CHICK BOONE

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Mt. Vernon January 16, 1894.*

1. CRIMINAL LAW—GRAND JURY—*accused as a witness.* The provisions of section 426 of the Criminal Code, and the positive prohibition of section 10 of article 2 of the constitution, alike preclude the right of the grand jury, or any court, to call upon the defendant, and in the first place to make him a witness, and require him to give evidence against himself.

2. Where a person in custody on a charge of murder is taken from the jail before the grand jury, and sworn, and examined as to the very matters on which he is indicted, the indictment should be quashed on motion of defendant, without any inquiry whether his testimony so obtained influenced the finding of the indictment or not, when it does not appear that the grand jury examined any other witnesses as to his complicity in the crime for which he is indicted.

3. This court does not hold, where one is before the grand jury as a witness, and at that time is not charged with crime, and may inci-

dentally be interrogated about a matter to which he makes answer, and an indictment is afterward found against him, that this would require the indictment to be quashed; nor does it hold that every case where one is before the grand jury as a witness, and interrogated about a matter for which he may afterward be indicted, would be, of itself, sufficient cause to quash the indictment.

4. SAME—*grand jury a part of the court—witness testifying before, testifies in open court.* The grand jury constitute a part of the court, and their official acts in finding true bills or ignoring bills are borne into the records of the court, and witnesses sworn before that body are sworn in open court, though not necessarily in the presence of the judge.

5. SAME—*instruction as to defendant being an accessory.* On the trial of one on a charge of murder, with another, the court, on behalf of the People, instructed the jury, that if they believed, from the evidence, beyond a reasonable doubt, that the defendant shot and killed S., or that he aided or abetted any other person or persons in pursuance of a conspiracy or agreement, it matters not that such evidence was circumstantial: *Held*, that the instruction was erroneous, for the reason that the last clause did not require that the conspiracy or agreement in which the defendant aided any other person or persons, was to kill S., and left it to the jury to speculate as to whether the defendant was an accessory after the fact, and for want of evidence on which to base it.

6. INSTRUCTION—*not based on evidence tending to support it.* On the trial of one for crime, it is error to give an instruction based upon the theory of a conspiracy of the defendant, with others, to do the criminal act, when there is no evidence of the defendant having entered into such conspiracy.

7. PRACTICE—*improper remarks by State's attorney in his closing argument.* If the defendant wishes to assign for error improper remarks made by the State's attorney in his closing argument to the jury, he must at the time object to the remarks, and call upon the court to rule on the objection. Such objection can not be urged for the first time in this court.

8. PRACTICE IN THE SUPREME COURT—*sufficiency of the evidence, how questioned.* The assignment for error of the refusal of the court below to grant a new trial in a criminal case presents the question whether the evidence is sufficient to sustain a verdict of guilty.

WRIT OF ERROR to the Circuit Court of Randolph county; the Hon. B. R. BURROUGHS, Judge, presiding.

At the September term, A. D. 1892, of the circuit court of Randolph county, the plaintiff in error and one John Wenda were indicted for the murder of Theodore Sewell, who was shot, and his death resulted from such shooting, on the night of the 26th day of July, A. D. 1892. A motion to quash the indictment was entered by Boone, which was overruled, and the defendants, Boone and Wenda, were arraigned. A motion for a separate trial, made by Wenda, was allowed, and a jury impaneled for the trial of Boone, which trial resulted in a verdict and judgment of guilty, and the defendant, Boone, was sentenced to imprisonment in the penitentiary at Chester for the term of twenty-five years. The defendant, Boone, sues out this writ of error, and assigns as error the refusing of certain instructions asked by the defendant and the giving of certain instructions asked by the State, the admission of improper testimony on the part of the State, the overruling of the motion to quash the indictment, the overruling of the defendant's motion in arrest of judgment, and the overruling of the defendant's motion for a new trial.

The error assigned in overruling defendant's motion for a new trial presents the question as to whether the evidence is sufficient to sustain the verdict of guilty. The theory of the prosecution seems to have been that Wenda had been guilty of arson, and Sewell had knowledge thereof and extorted money from Wenda, and that to prevent any disclosures being made, Sewell was killed by Boone at the instigation of Wenda. The only evidence to connect the latter with the crime of arson, appearing in this record, are certain declarations of Sewell as to his knowledge, and the testimony of Mrs. R. Sewell, Lou Sewell, William Pearce and William Aszman, who were called as witnesses, and testified that Sewell at various times obtained money from Wenda, and had on one or more occasions been heard in an angry conversation with him; but no connection between Boone and Sewell, or between Boone and

Wenda, in reference to any transaction in which Sewell obtained money from Wenda, is in any manner shown.

Henry Schuchert testified that on the 26th of July, about noon, he saw Boone and Sewell take a drink together in Aszman's saloon. John Divine testified that he thinks he saw Sewell and Boone together in the evening of the 26th, and Joseph Prosh testified that on that evening Boone got a bucket of beer between ten and eleven o'clock at night, and went in the direction Sewell's body was afterwards found. Mrs. Ida Divine testified that on the night of the 26th of July she saw the defendant, Boone, pass her door about eleven o'clock, and about a quarter after eleven saw him cross the street going towards where Sewell was subsequently found dead, carrying a can of beer, and saw him sitting with a man near the point where Sewell was afterward found dead. She further testified, that between twelve and one o'clock she heard a noise that awoke her, and that about three-quarters of an hour afterwards, which was at twenty minutes after one, she saw the defendant going apparently away from her house, and on the side of the street opposite from where Sewell was found dead. Edward R. Emmerson testified that on about the 17th of August he saw the defendant under a shed, where he was soon joined by Wenda, who had a conversation with him for twenty or thirty minutes. Florence Mittendorf testified that between nine and eleven o'clock on the morning after Sewell was killed she saw defendant going towards Wenda's house. Kinsey Cohen testified that between eleven and twelve o'clock on the morning after Sewell's death he saw the defendant coming from towards Wenda's house. Mrs. William Tindel testified that between nine and ten o'clock in the morning after Sewell was killed, the defendant called at her house and inquired of her where William Miller lived, and that Miller was a son-in-law of Wenda. Jack Ragsdale testified that the defendant told him on the next day after the murder that he went out to Wenda's house between ten and eleven o'clock,

and went with him back into the soda factory, and Wenda took from his pocket and gave to the defendant five dollars, and said, "Sewell is done for," and asked him, Boone, if he had said anything up-town about the shooting, and he replied that he had heard something about it. That conversation was on the 13th of August. He further testified that about the 15th of August the defendant stated that he met Wenda under the hill, and he had given him five dollars more in Divine's back yard. The defendant subsequently claimed that Wenda had given him ten dollars at Shaddock's old planing mill and five dollars near the railroad, and that he afterwards got twenty-five dollars from Wenda, and once when going to Sparta got five dollars from him. These statements are all testified to by Ragsdale as statements made by the defendant to him. The evidence of Ragsdale further shows that he was endeavoring to find who committed the murder, and the defendant was acting with Ragsdale as a detective, and desired Ragsdale to overhear a conversation between him (defendant) and Wenda. Peter Glass testified that about the 15th to the 17th of August he saw the defendant with money,—bills,— two tens, two fives and one two dollar bill. George Boone testified to seeing Wenda give the defendant some money, and to having heard Wenda tell the defendant to keep still, and afterward Wenda said to witness, "Tell Chick (the defendant) to keep still; I don't want him to give me away; I would not have him give me away for one hundred dollars." Witness further says: "I told Chick what he said. Chick said: 'I am going to tell this to others; I am not going to have people accuse me.' He said he knew something—he believed he would turn it up. If he kept this they would turn it on him." Witness further testified the defendant said he knew the man who said he killed Sewell; that the defendant said he did not know who did the killing except what somebody told him. Minnie Piles testified that between ten and eleven o'clock on the morning after the killing she had a conversation with the

defendant, and asked him if he did the killing, and when he said no, she replied, "I believe you did it," at which he laughed and said, "Keep still—I will make a hundred dollars." John Divine testified that he had a conversation with the defendant about the killing and the reward. The defendant said he "knew the man that hired him killed; he could produce the man that had Sewell killed, but did not know the man that killed him." Edward Boone testified that at the request of the defendant he took a note to Wenda, and the defendant said Wenda would give him five dollars, but Wenda refused to give him the money. William Davis testified he saw the defendant with money a few days or a week following the killing of Sewell; that "the defendant was a sort of trader." John Meredith testified he was in a bus within thirty or forty feet of where Sewell's body was found, and in the bus with him were three or four men. He and one of the men with him were awake, and heard a shot fired between eleven and two o'clock at night. At the time he heard the shot he thought it was in a direction opposite from where the body was afterwards found. After the shot was fired he heard a man groan, and left the bus and went within six feet of the body of Sewell, but did not recognize him, although he had a lantern and knew Sewell well. He heard no one walk away until about three-quarters of an hour afterwards, when he heard some one cross the street. He could not recognize Sewell because of the darkness of the night. Charles Miller testified that he heard a pistol shot fired ten or fifteen minutes after twelve, which appeared to be in the direction of where the body was found, and heard some one he thought was snoring, and went to within three or four feet of the body, but did not recognize the man because of the darkness, although he knew Sewell. When he heard the report of the gun he was about one hundred and fifty feet away from the body. The next morning, between five and six o'clock, he recognized Sewell, who was still breathing, and he saw a wound in the back of his head.

Dr. McMenomy, a practicing physician, testified that he found a gunshot wound from a rifle or pistol in the back of the head of Sewell, but no evidence of powder burn.

This was substantially all the evidence for the State, and the evidence of witnesses called in behalf of the defense in no way tended to strengthen the case against the defendant when he was placed upon the stand. He denied all guilt, and after being cross-examined at great length was asked by the State's attorney if he knew who killed Sewell, and answering in the negative, was then asked, "Do you know who had him killed?" and that question being objected to by his counsel, the court ruled he might answer if he wanted to. The defendant was then informed by the State's attorney that he need not answer unless he wanted to, and no answer being made he was then asked if he was going to answer, to which no reply was made. The evidence also discloses the fact that a steamboat landed at the wharf on the night and preceding the homicide, and was there some time, unloading and receiving freight, and that there was much noise and confusion. The place of the homicide was but a short distance from the landing. The evidence is uncertain, however, as to whether the boat was at the landing, and the noise and confusion therefrom was at the time the report of the gun was heard.

A motion to quash the indictment was made, based on the fact that the defendant was taken from the jail and before the grand jury which found the indictment, and sworn as a witness, and examined as to the homicide. That was shown by the affidavit of the defendant. The motion to quash was overruled, and the defendant excepted.

At the request of the State's attorney the court instructed the jury as follows:

"3. The court instructs the jury, as a matter of law, that if they believe, from the evidence, beyond a reasonable doubt, that the defendant and others, known or unknown, conspired and agreed to kill Sewell, and in pursuance of such conspiracy

Sewell was killed, the defendant, Chick Boone, is guilty of murder, whether present at the killing or not.

"4. The court instructs the jury, that if you believe, beyond a reasonable doubt, that the defendant shot and killed Sewell, or that he aided or abetted any other person or persons, in pursuance of a conspiracy or agreement, it matters not that such evidence is circumstantial."

The affidavit of James J. Morrison, one of the counsel for the defendant, shows that R. E. Sprigg, State's attorney, in his argument before the jury, said that the defendant was guilty of the crime and ought to be convicted; that even if the jury convicted him wrongfully, he had the right to appeal the case to the Supreme Court,—the case would be reviewed by the Supreme Court,—and if any wrong was done the defendant the Supreme Court could grant him a new trial, but if the jury acquitted the defendant he would be turned loose whether guilty or not, as the People could not appeal the case. The jury found the defendant guilty, and fixed his punishment at imprisonment in the penitentiary for the term of twenty-five years. A motion for new trial was entered and overruled, and thereupon the defendant entered his motion in arrest of judgment, because he was called as a witness and compelled to testify as to the killing of Sewell, before the grand jury which returned the indictment against him. The fact of his being so called, and his being so examined as to the killing of Sewell, is shown by the affidavit of A. C. Thompson, a member of the grand jury which found the indictment, and by the affidavit of the defendant. The motion in arrest of judgment was overruled, and the defendant sentenced in accordance with the verdict. Exceptions were taken to the several rulings of the court.

Mr. JAMES J. MORRISON, and Mr. DOW E. DETRICH, for the plaintiff in error.

Mr. M. T. MOLONEY, Attorney General, for the People.

Mr. Justice Phillips delivered the opinion of the Court:

The assignment of error first alleged is in overruling defendant's motion to quash the indictment, which was based on the fact that defendant was taken from the jail and examined as a witness before the grand jury that found the indictment against him, and was compelled to testify before said grand jury regarding his guilt or innocence. That motion is supported by the affidavit of the defendant. The grand jury constitutes a part of the court, and their official acts in finding true bills or ignoring bills are borne on the records of the court, and witnesses sworn before that body are sworn in open court, though not necessarily in the presence of the judge. (1 Bishop on Crim. Proc. sec. 868.) By section 10 of article 2 of the constitution of the State of Illinois it is declared: "No person shall be compelled, in any criminal case, to give evidence against himself." When the disqualification of a defendant in a criminal case as a witness in his own case was removed by section 426 of the Criminal Code of Illinois, it was expressly provided "that a defendant in any criminal case or proceeding shall only at his own request be deemed a competent witness, and his neglect to testify shall not create any presumption against him, nor shall the court permit any reference or comment to be made to or upon such neglect." The provision of the statute and the positive inhibition of the constitution alike preclude the right of the grand jury, or any court, to call upon the defendant, and, in the first place, make him a witness, and require him to give evidence against himself. It is of the highest degree of interest, and most important, to preserve that peculiar excellence of the common law system which has never allowed a proceeding to establish guilt to be inquisitorial. The affidavits in the record show that the defendant was taken from the jail where he was held in custody, and taken before the grand jury, where he was examined touching the very matter on which that grand jury found an indictment against

him and on which he was placed on trial. A right of the highest character was violated, a privilege sacredly guaranteed by the constitution was disregarded, and a dangerous innovation in the uniform practice in this State made. A danger so great, if it once became a rule of law, that one ignorant of his rights, and, it may be, also of his danger, unattended by counsel and unprotected by a court, could be called before a grand jury and interrogated, and, as he may believe, compelled to answer charges made against him on a subject matter of investigation then before that body, in which his interest is vital, that we will not stop to inquire into the question as to whether the indictment was found on that testimony alone, nor whether that testimony influenced the finding where, as here, the defendant is in custody charged with a crime, and whilst so in custody is taken from the jail to be examined about that subject matter. It is sufficient that so important a right was violated and such a proceeding had where an indictment was found under such circumstances.

But were that otherwise, it does not appear that any other evidence was heard before that grand jury on which this indictment was found. We do not hold that where one is before the grand jury as a witness, and at that time is not charged with crime, and may incidentally be interrogated about a matter, to which he makes answer, and an indictment afterwards is found against him, would require the indictment to be quashed; nor do we hold that every case where one is before the grand jury as a witness, and interrogated about a matter for which he may afterward be indicted, would be, of itself, sufficient cause to quash the indictment. But in this case it does not appear that the grand jury examined any other witnesses, nor does it appear the indictment was not found on the evidence of the defendant alone. No affidavits are filed by the State's attorney on that question, and where, as here, the defendant charged with crime is taken from the jail and before the grand jury, and interrogated about the

29—148 ILL.

matter with which he is charged with crime, such an error must be held fatal to the indictment. It was error to overrule the motion to quash the indictment. *The State* v. *Froiseth,* 16 Minn. 296.

The entire scope and purpose of the evidence introduced against the defendant in seeking to show that the deceased, Sewell, apparently demanded money of Wenda, and threatened him, and that Wenda subsequently paid the defendant money, and the defendant was in company with deceased the day and evening of the homicide, were for the purpose of showing the defendant himself was the chief actor in taking the life of Sewell and fired the fatal shot, and the admission of much of that evidence could only be justified on that theory. There was no attempt to show that there was any other actor,—no evidence introduced on the part of the State to connect any one other than Wenda and the defendant, either directly or indirectly, with the death of Sewell. Under this state of facts, as shown by this record, there was no evidence on which to base the third instruction given at the request of the State's attorney, and it was error to give it. The testimony of Divine as to the declaration of the defendant "that he knew the man who hired Sewell killed," and the testimony of George Boone, a brother of the defendant, who testified to the defendant's declaring that "he believed he would turn this thing up; if he kept it they would turn it on him; I know the man who said he killed Sewell," and of Minnie Piles, who testified that on the morning after the killing she asked defendant if he did it, and he said no, and she then asked, "Don't you know about it?" and he answered and said, "Keep still—I will make a hundred dollars," was, with the other facts and circumstances, before the jury. The testimony of Ragsdale shows that the defendant was aiding him in an endeavor to find the guilty party, requested him to overhear a conversation between Wenda and himself, and was assuming to act as a detective. The declarations of the defendant testified to by Divine, George Boone

and Minnie Piles are all explicable when taken in connection with the testimony of Ragsdale, and the part attempted to be acted by the defendant as a detective. Puffed up in his own conceit at the importance of the part he was taking he makes declarations of knowledge, but in all those declarations there is no admission of guilt on his own part. If, however, they were by the jury believed to be true, the jury might well believe he had a knowledge of the instigator of the crime, if not of the crime itself, which he was concealing.

This being the state of facts, and the attention of the jury being erroneously called to a conspiracy to commit this offense as by the third instruction for the prosecution, the giving of the fourth instruction on behalf of the People was clearly erroneous. That instruction was:

"The court instructs the jury, that if you believe, beyond a reasonable doubt, that the defendant shot and killed Sewell, or that he aided or abetted any other person or persons, in pursuance of a conspiracy or agreement, it matters not that such evidence is circumstantial."

The last clause of the instruction does not require that the conspiracy or agreement, in which the defendant aided any other person or persons, was one to kill Sewell, and left it to the jury to speculate as to whether the defendant was an accessory after the fact, and, like the third instruction for the People, there was no evidence on which to base it.

The remarks of the State's attorney in his closing argument are brought into the record by the affidavit of one of the counsel for the defendant. It was held in *The State* v. *Kring,* 64 Mo. 591, where it was said in argument if the jury wronged the defendant the wrong could be righted by the Supreme Court: "The statement that the higher court had the power to review the findings of the jury on the weight of the evidence, was calculated to induce the jury to disregard their responsibility." That language is cited approvingly by this court in *McDonald* v. *The People,* 126 Ill. 150. We have carefully examined the

record and fail to find that any objection was made by counsel for defendant at the time, or that the trial court was called upon to rule on that question. It can not be raised for the first time in this court, and that error is not well assigned.

From a careful examination of the evidence in this record it appears that on the night and at the time the shot was fired that killed Sewell it was very dark. All the witnesses say it was dark. Within a few moments after the shot, two men, at two different times, went within four to six feet of the body of Sewell,—one with a lantern,—and, although well acquainted with Sewell, were unable to recognize him. All the testimony agrees as to this fact, unless it be that of Mrs. Ida Divine, who says "it was a dark night, but the stars were out," and Mrs. Divine claims to have recognized the defendant some distance away, both about an hour before and a half an hour after the report of the gun. If the night was as dark as claimed by the witnesses, it is inconceivable how one could aim either a rifle or pistol with sufficient accuracy to shoot a man in the head at some distance away. If the shot was fired in close proximity, so as to require no aim, it is alike almost inconceivable that there would be no powder burn. These facts are prominent in this record, and no fact is more positively shown than that John Meredith was nearest the body of Sewell at the time of the shooting, and thought the report of the gun was in a different direction from that where Sewell was found. The evidence of the defendant's guilt excites such distrust, from the facts appearing in the record, that the Attorney General is compelled to say, "I have serious doubts as to the sufficiency of the testimony to sustain the verdict below." Without discussing all the facts, we hold the evidence in the record is not sufficient to sustain a conviction, and it was error to overrule the motion for a new trial.

For the errors indicated the judgment must be reversed and the cause remanded.

*Judgment reversed.*