### UNITED STATES v. KIMBALL

#### UNITED STATES v. KIMBALL et al. (two cases).

#### (Circuit Court, S. D. New York. March 7, 1902.)

#### (Nos. 1-3.)

**1. WITNESSES—APPEARANCE BEFORE GRAND JURY—PRIVILEGE.**

Code Cr. Proc. N. Y. § 393, declaring that the defendant in all cases may testify as a witness in his own behalf, but his neglect or refusal to testify does not create any presumption against him, applies only to "defendants," or persons against whom a charge has been brought, and is not the same as the constitutional provision declaring that no person shall be compelled to testify against himself, which provision includes, not only defendants, but all witnesses.

**2. SAME—INDICTMENT—USE OF EVIDENCE.**

Where an investigation before a grand jury is in progress for the purpose of ascertaining whether a crime has been committed, not based on any complaint or formal accusation, evidence given in such

investigation by persons subsequently indicted is not used elsewhere, in violation of Rev. St. U. S. § 860, declaring that any evidence voluntarily given by a witness cannot be used against him in any criminal prosecution.

**3. SAME.**

That a person subsequently indicted was subpœnaed before the grand jury and compelled to take the usual oath was not an infringement of his constitutional right not to testify against himself; he not being able to claim his constitutional privilege until he had been sworn as a witness.

**4. SAME—COMPULSION.**

Where defendants were subpœnaed to appear before a grand jury and testify in an investigation concerning matters in which they were the principal actors, and before any complaint or accusation had been brought against them, and before appearing had time to consult counsel, and on appearing stated that they were desirous of an opportunity to testify, and made no claim of their constitutional privilege to refrain from testifying, they were not "compelled" to testify, within the constitutional prohibition declaring that no person shall be compelled to testify against himself, so as to invalidate an indictment subsequently found on evidence disclosed.

**5. SAME.**

Where a witness, on appearing before a federal grand jury in response to a subpœna, stated that he had been advised not to answer any questions in regard to the subject under investigation, on the ground that his answers might tend to incriminate him, and he was thereupon fully informed that he could not be so compelled to testify, and he continued to answer questions or not, according to his free will, he could not thereafter claim, on a motion to quash an indictment against him, that his constitutional privilege was violated.

Henry L. Burnett, U. S. Atty., and Ernest E. Baldwin, Asst. U. S. Atty.

Hoadley, Lauterbach & Johnson and Edward Lauterbach, for defendant Kimball.

Underwood, Van Vorst, Rosen & Hoyt (William M. K. Olcott and Frederick B. Van Vorst, of counsel), for defendant Poor.

Lorenzo Semple, for defendant Rose.

THOMAS, District Judge. The indictment in action No. 1 charges in several counts that Kimball, while president of the Seventh National Bank in the city of New York, to evade the provisions of section 5208 of the Revised Statutes of the United States, resorted to a certain device, pursuant to which he certified and caused to be certified certain checks drawn upon the bank by the firm of Henry Marquand & Co. (consisting of Henry Marquand and the defendant Poor), at times when such company did not have on deposit with the bank an amount of money equal to the amount specified in the checks, in violation of such section, as amended by section 13, Act Cong. July 12, 1882 (1 Supp. Rev. St. p. 357). The indictment in action No. 2 charges a conspiracy between Kimball and Poor to commit an offense against the United States by a violation of such statute, in and by the certification of checks of Marquand & Co., and that pursuant to such conspiracy Poor drew checks at several times stated and Kimball certified the same. The indictment in action No. 3 charges that Kimball, while president, and Rose, while paying teller, of such bank, unlawfully certified checks of Marquand

& Co., at several times stated, in violation of such statute; the latter executing the certification under the direction of the former. The defendants moved in the first instance to inspect the minutes of the grand jury, that they might base thereon a motion to quash the indictments. The defendants brought on the second motion at the suggestion of the court, and it has been heard in connection with the first motion. The motions, at the time of submission, were based upon affidavits of the moving parties; but since the matter has been under consideration the stenographic minutes containing the examination of Rose have been added to the record by order of the court. The United States has offered no evidence beyond the affidavit of the United States attorney, stating the mere fact that 17 witnesses were subpœnaed and testified before the grand jury.

In the summer of 1901, the Seventh National Bank, theretofore doing business in the city of New York, failed, and the grand jury undertook an investigation of its previous transactions, with the obvious purpose of discovering whether its affairs had been conducted lawfully. It is inferable that this inquiry was initiated without complaint or knowledge that any given person had committed an offense that aided the failure, and the subpœnas issued to the witnesses, including the defendants, were in the form served upon Kimball. This was the usual subpœna commanding the proposed witness to appear before the grand jury, at a time and place designated, "to testify all and everything which you may know concerning the matter of the failure of the Seventh National Bank of New York City, on the part of the said United States; and this you are not to omit, under the penalty of two hundred and fifty dollars." Kimball complied with this summons, and appeared before the grand jury at the appointed time and on one or two subsequent dates.

From the affidavits of the three defendants and the United States attorney, the facts, so far as ascertainable from them, may be summarized as follows: (1) The defendants, being 3 of 17 witnesses summoned and testifying, knowing that the failure of the Seventh National Bank was under investigation, but not that indictments were contemplated against them, each gave evidence relating to checks drawn in the name of Marquand & Co., by the hand of Poor, upon the bank of which Kimball was president and Rose the paying teller. (2) Each defendant had opportunity to take legal advice,— Kimball, if not before he began his evidence, at least before he completed it upon a subsequent day or days; Poor between July 25th and 30th, and especially on the 25th day of July, when he appeared at the United States attorney's office, accompanied by his counsel, and asked for an adjournment to meet several lawyers and others respecting the affairs of Marquand & Co.; and Rose before he testified, inasmuch as he announced that he had been advised by counsel. (3) Kimball was advised by the United States attorney that he was at liberty to refuse to answer any question, and that whatever he said would not be used against him elsewhere, to which he replied that he would be glad to have the opportunity of explaining anything which occurred in relation to the matters of the bank, and thereupon gave his evidence, although he states that he believed

that a refusal to answer questions might be construed by the grand jurors as evidence that there had been wrongs committed by him, but that, having been compelled to appear, and being in the jury room, he felt constrained and compelled to answer such questions as were asked of him, and that the district attorney discussed with him, before the grand jury, his right to do certain things, some of which were made the subject of the indictments. Poor was not so advised by the United States attorney, but raised no objection to giving his evidence. Rose, upon being asked a question at some stage of the examination, objected to answering the question upon the ground that it might tend to incriminate him, but, upon being advised by the United States attorney that it was his right to refuse to answer questions that tended to incriminate him, but that the question asked did not tend to incriminate him, and that he could be compelled to answer the same, the defendant did answer it, and gave his other evidence without objection, not being able to distinguish between questions whose answers would, and those that would not, incriminate him. This evidence of Rose is modified decidedly by the minutes of his evidence hereafter discussed. (4) All the defendants state that, had they supposed or been advised that statements made by them would or could be considered against them by the grand jury, and were intended to be so used, they would have declined to submit to the examination, or at least to a part thereof. Hence it appears from such affidavits that each of the defendants,—two of them, Poor and Rose, shown to have had counsel before appearing,—knowing the occasion and nature of the inquiry and his relation to the checks, gave evidence; that Kimball was advised of his privilege by the United States attorney, and declined to avail himself of it; that Poor was not so advised by him, and that Rose was so advised, and declined to answer one question, but finally answered it, upon being told that the answer could not incriminate him and that he could be compelled to answer; and that certain of the evidence given by each witness (for the present this statement will be left applicable to Rose) was relevant and material to the subject-matter of the indictment. It will further be observed that none of the defendants states that he had not the benefit of counsel before going before the grand jury.

In the course of their argument the defendants evolved these propositions: (1) That an obeyed summons to the defendants to appear before the grand jury, and consequent evidence touching matters thereafter charged in an indictment against them, violated the constitutional provision that no person "shall be compelled in any criminal case to be a witness against himself," and that in the case of Rose the compulsion was aggravated by the insistence of the United States attorney that he should answer, after he had objected to a certain question. (2) That merely subpœnaing the defendants before the grand jury, and requesting them to testify, violated their right to choose whether they would give evidence in a proceeding wherein they were charged as defendants; that is, an indictment found by a grand jury is illegal, if the person charged in it attended pursuant to a subpœna, and gave or refused to give

evidence touching its subject-matter. (3) That under section 860 of the Revised Statutes their evidence was improperly used against them in finding the indictments.

For convenience the second and third propositions may be first considered. The competency of a defendant, in a criminal case in New York, to testify therein, is now stated in section 393 of the Code of Criminal Procedure:

"The defendant in all cases may testify as a witness in his own behalf, but his neglect or refusal to testify does not create any presumption against him."

The law of the state has removed the disability of a defendant in a criminal case to testify, and permits him to stand mute or to testify as he wills, and protects his choice from any suggestion of the prosecuting party, as well as unfavorable inference by the jury. No right of this nature springs from the constitution. Such a defendant could not, before the statute, be asked to take the witness stand, because, on account of his status, he could not be a witness voluntarily or compulsorily; and the disability now continues, unless of his own motion he elect to remove it. To demand or to request that he shall be sworn is an attempt to choose for him, which constrains his acceptance and coerces him to make public choice in the presence of the jury. This would be misconduct on the part of the prosecution, intended and calculated to harm the defendant, disturb his free choice, and prejudice the jury in the case of declination. This protection relates solely to a defendant. But a person cannot be regarded as a defendant, so as to render him such an incompetent witness, until some process is directed against him (U. S. v. Brown, 1 Sawy. 531, Fed. Cas. No. 14,671; see, also, U. S. v. Reed, 2 Blatchf. 435, Fed. Cas. No. 16,134); that is, until he is selected by some judicial method as a subject of accusation. Then he is exempt from a request in the presence of the jury to give evidence in the immediate proceeding. This immunity does not flow from the constitution, but the law of the state. The constitutional provision is not directed to defendants, but is a common shield for all persons summoned as witnesses. It is for the protection of witnesses, irrespective of their relation to the proceeding. The constitution includes persons who are defendants, so far as they belong to the whole class of competent witnesses (Counselman v. Hitchcock, 142 U. S. 547, 12 Sup. Ct. 195, 35 L. Ed. 1110); but at the time of the adoption of the provision the class known as "defendants" was under disability, and hence could not have been contemplated. It may not be considered that the constitution intended to protect persons having the status of defendants from giving evidence against themselves, when the law forbade them from being witnesses at all. But when the disability was removed they came within its protection, not because they were defendants, but because they might be witnesses. Moreover, when a defendant is protected by the state statute from being called, and yet offers himself as a witness in his own behalf, he cannot claim the protection of the constitution as to the charge involved, while, if he be a mere witness, and unrelated as defendant to the proceeding, he may end his evidence whenever it guiltily connects him even with the immedi-

ate offense under investigation. The present parties stood in no such relation to the proceeding, nor would they, if they had gone unsubpœnaed before the grand jury. They could object when and where they would to incriminating evidence. But this statement of the relation of the constitutional provision to a defendant should not be misunderstood. A person charged as a defendant may be in such condition of duress that the court may infer that he was "compelled," as the word is used in the constitution, from the very fact that he is brought before the jury and thereupon gives evidence; that is, compulsion may be presumed from the circumstances, but not from his mere technical relation as defendant.

What is illustrated by the discussion to this point is: (1) That summoning a person, a defendant, before a jury, and asking him to answer, is not per se a violation of the constitution, but at most of the law of the state; (2) that, if he thereupon give evidence, his mere status as a defendant does not presume a violation of the constitution, for non constat he may give evidence in his own favor, or he may, if he wish, give evidence against himself, as in the case of an accomplice who becomes a witness for the government; (3) but compulsion in certain cases may be presumed, not from the legal status, but from the duress into which that status has brought him, as will appear later. But the present defendants had not yet become such when they gave their evidence. The proceeding of the grand jury was an investigation. This is suggested, not for the purpose of showing that it was not a criminal case within the meaning of the constitution, but (1) to aid the conclusion that the witnesses (the present defendants) were not then defendants, so as to be protected by the law of the state from being called; (2) to illustrate that they did not stand in such technical or practical relation to the procedure that summoning them and accepting their evidence could be regarded, even in the most extreme view, as compelling persons in fact, even if not technically charged, to give evidence against themselves; (3) to illustrate that section 860 of the United States Revised Statutes has not been violated.

An important national bank had failed, and the cause did not appear. No person could be brought before a magistrate, because no one was accused, and, so far as appears, no one was known or suspected, nor had it been ascertained whether the failure arose from criminal acts or the misfortunes of business. The investigation was intended to discover facts, and determine whether such facts showed that an offense had probably been committed. The proceeding was mere investigation, directed to discovery, not aimed at specific individuals But, as the defendants show by pertinent authority, upon the evidence taken at any and all times before it, a grand jury may select probable offenders and find indictments against them. People v. Rutherford, 47 App. Div. 209, 62 N. Y. Supp. 224; People v. Northey, 77 Cal. 627, 19 Pac. 865, 20 Pac. 129. So repeated indictments may be found on the same evidence against the same persons. State v. Clapper, 59 Iowa, 279, 13 N. W. 294; State v. Andrews, 35 Or. 388, 58 Pac. 765; Hampton v. State, 67 Ark. 266, 54 S. W. 746; State v. Peterson, 61 Minn. 73, 63 N. W. 171, 28 L. R. A. 324;

Creek v. State, 24 Ind. 151, 156. The evidence elicited on a charge against one person could be used to indict another. State v. Beebe, 17 Minn. 241 (Gil. 218). The evidence is not taken with such formality that, when an indictment is found, the evidence has fulfilled its entire use. After evidence has been taken in an investigation, and the jury votes upon the question whether this shows that A. has probably committed an offense, its vote is taken in the same proceeding, and the evidence taken is not used elsewhere, within section 860 of the Revised Statutes of the United States. The defendants' position that, if the present defendants were not such during the investigation, they became later specific subjects of consideration, and that the evidence taken during the general investigation could not, under section 860, be used to indict them, is untenable. They did not become defendants in the matter before the grand jury until the indictment was found, and the evidence taken prior to such indictment was at all times a part of the same proceeding. Had they been arrested upon warrant issued by a court or commissioner, they would have been defendants under that warrant, and, had they been held under any legal process, they might have been regarded as such. But that a person not even the subject of a complaint is a defendant is the merest chimera.

Returning, now, to the first general proposition, above stated, for which the defendants contend, it will be found that the defendants seek in effect to establish that under the constitutional provision no person, except upon his own request, is a competent witness before a grand jury touching matters made the subject of an indictment against him by such grand jury; that is, an indictment found by a grand jury is illegal, if the person charged in it attended before the grand jury pursuant to subpœna, and, even without objection, gave material evidence, especially if he were not warned or enabled to know that inquiry might bring him into jeopardy. The United States attorney tersely interprets the defendants' construction of the constitutional provision, as follows:

"(1) It would mean that the grand jury as an inquiring body has no right to issue its process to any person who might know or have knowledge concerning any crime to be investigated, if there should be any chance that the person so subpœnaed might in any way become criminally involved in the crime under investigation, and therefore subject to an indictment, and would entail upon that body the impossibility of ascertaining in advance whether there could be any chance of the witnesses' culpability becoming apparent. (2) It would mean that an indictment would be invalid if the person against whom it was found had been supœnaed to appear before the grand jury, had appeared, and had been interrogated concerning the participation of any other person in the charge. (3) It would absolutely destroy the usefulness of a grand jury to inquire into crimes generally, or into violations that have been brought to their notice, other than cases that had been held for the grand jury by the respective committing magistrates. (4) It would mean that the compulsion denounced in the constitutional amendment begins the moment the process of the grand jury is actually served upon the party to whom it is directed, provided he is in any way connected with the event."

With the defendants' claims, and the government's clearly stated objections to them, in view, it will now be considered in what spirit

and manner the constitution as here involved should be construed. It is not infringement of constitutional provision to subpœna a person before a grand jury and to administer to him the usual oath. The defendants correctly state:

"It is well settled that a witness cannot claim his constitutional privilege until he is sworn. He must take the oath, so that his assertion of privilege shall be made under that sanction."

In support thereof they cite In re Scott (D. C.) 95 Fed. 815; Ex parte Stice, 70 Cal. 51, 11 Pac. 459; In re Rancour's Petition, 66 N. H. 172, 20 Atl. 930; Whitcher v. Davis (N. H.) 46 Atl. 458; In re Leich, 31 Misc. Rep. 671, 65 N. Y. Supp. 3; People v. Seaman (Sup.) 29 N. Y. Supp. 329. See, also, Skinner v. Steele, 88 Hun, 307, 34 N. Y. Supp. 748. If a person cannot claim his privilege until he has been sworn, it logically follows that the constitutional provision cannot until that time be violated. It cannot be violated before it can be invoked for his protection; hence the conclusion is that compulsion, within the meaning of the constitution, does not arise from mere summoning and swearing the witness. It will not be considered whether compulsion can be predicated upon the added fact that a person gave evidence under ordinary conditions of personal freedom.

What is compulsion? Compulsion is the antithesis of willingness. The provision means that no person shall be forced to be a witness against himself against his free will. This does not mean that he may not be a witness against himself; otherwise, an accomplice could not testify. It does not mean that any person may not be called and sworn (barring persons under known legal disability). It is an exception that leaves all persons competent to be witnesses, subject to a call to testify, but enables any of such persons to exempt himself from the whole class by pleading that certain evidence which he is called upon to give will tend to show that he has committed an offense. Hence those competent and free-willed to do so may give evidence against the whole world, themselves included; but those unwilling may not be coerced, if it appear that the unwillingness arises from incriminating evidence which they are asked to give. But willingness or unwillingness is subjective, and may be known alone by act, conduct, speech, or perhaps, in extreme cases, by condition. Unless the witness exhibit his unwillingness in some manner, it cannot be presumed to exist. This is especially true, if his conduct be that of a man untrammeled, if he be free from bodily restraint or physical duress, unterrified by menace, and uninfluenced by cajolery or fraud. · Presumptively the person summoned belongs to the general body of citizens, competent to testify, and so he may be considered. If he elect to be excepted from this class he must speak, or his condition or relation to the proceeding must speak for him; for exemptions are allowed only to those who ask for them. Nor is this statement the less true because, as will later appear, he should have a fair opportunity to speak. From this it follows that in a legal sense the doctrine of waiver has no application. The constitution intends that a person shall not give incriminating evidence under compulsion. Immunity from compulsion is the right reserved. This is a qualification of a general duty to testify. It implies that all

competent witnesses shall testify when duly summoned to do so, under the usual rules and limitations provided by law, but not against themselves by compulsion. The right of not being compelled, in its very nature, does not admit of waiver. Compulsion and consent— i. e., waiver—cannot coexist. Conversely, compulsion can only exist when there is something to be overcome, as, for instance, refusal, objection, or an unwillingness of which the jury is apprised. Hence that refusal, objection, or unwillingness must affirmatively appear before compulsion is possible, and it has already been shown that it cannot appear from his speaking, until the witness has been sworn.

But, to illustrate the discussion: When Mr. Poor, without a shadow of remonstrance, gave evidence, after having come to the court house in company with counsel, and after full opportunity to consult the same, what sign was there which notified the grand jury, or would have notified a judge, had one been present, that he was speaking, or was asked to speak, other than as he willed, or that he acted under legal constraint? There was nothing on which compulsion could act, nothing to initiate it, nothing to demand it. How much the more was there inferable free will and absence of constraint in Kimball's case, who expressed himself as glad of opportunity for explanation. Kimball states in his affidavit that he "felt constrained and compelled" to testify, while in effect he said before the grand jury, when his power of exemption was suggested, that he was glad to speak. He may not complain if, having assured the jury that he was glad to speak, when he was not, the jury credited, rather than suspected, his truthfulness. The courteous advice of the United States attorney he put aside, welcoming the opportunity to testify. The occasion which he then applauded as a desirable opportunity he now accuses as an oppression and violation of his rights. The fact is, as will later more fully appear, that these two witnesses knew full well their relation to the ruined bank. They undoubtedly did not act without the advice of skillful counsel. The opportunity to sway the minds of the jurymen does not appear to have been unwelcome. They failed in the desired result, and now condemn the government for summoning, swearing, and examining them, to no one of which acts they did or said aught in disapproval. Nay, more; they censure the United States attorney because he did not apprehend their ignorance, the possibility that they might be delinquent, their concealed unwillingness, their repressed timidity in asserting their privilege. In Kimball's case, what more could the attorney have done, unless he had insisted firmly that he should retire from the presence of the jury? Having been visited by Poor, in company with counsel, observing no disposition indicating unwillingness, knowing him to be free in person and unfettered in mind, it is not strange that the district attorney did not warn him that the constitution protected him against self-incrimination and that there was a privilege that limited the power of the jury to examine.

This leads to the further conclusion that all persons, unless incompetent to be witnesses (and named defendants in criminal proceedings are under such disability), may be summoned and sworn and examined; that if one of such class be unwilling to testify, upon

the ground that he would become a witness against himself, he must express his unwillingness in some form, and bring himself within the rule that he who would have the benefit of an exemption or privilege must claim it. This conclusion has only apparent exceptions, that may be explained by a consideration of the ways by which compulsion may be exercised, or by absence of fair opportunity to claim the privilege. Compulsion need not be through legal proceedings, wherein the witness is directed to testify by order of the court. Any unlawful action by the district attorney, or by the jury, or other official, that should appear to have impaired the exercise of the free will of the witness in choosing whether he would testify, should be regarded as compulsion. In certain cases it may be immaterial whether such action be regarded as an infringement of the constitutional provision, or an unseemly perversion of the just administration of the law. The court should in either case have inherent power to redress the wrong. But it is considered that such misconduct might be such as to constitute compulsion within the meaning of the constitution. It would seem that the same rule should apply, if there was representation or action amounting to fraud, whereby the witness was not left free to exercise his choice. If a sole defendant were imprisoned upon a criminal charge, and were brought before the grand jury by his jailers, and testified against himself, whereupon an indictment was found, there would be such presumption of duress arising from his condition that the court would set aside the indictment, unless it should appear distinctly that the prisoner wished to be heard. Boone v. People, 148 Ill. 440, 36 N. E. 99, illustrates this, where the misconduct was as palpable as the probable compulsion. But it might be that the same presumption would not obtain from the mere fact that one of several wrongdoers gave evidence before the grand jury, taken from the jail to the jury room for that purpose. But none of the features just considered are present in the actions at bar, and reference is made to them merely to meet, approve, or distinguish certain decisions.

But it is urged that the indictment should be dismissed because the now defendants did not know that they were under investigation and subject to indictment, and hence did not demand their privilege, as otherwise they would have done. The defendants' brief, in urging the rule contended for by them, states:

"In these cases the grand jury was seeking information on which to base an indictment. It was impaneled for that object, and no other. The defendants were compelled to appear as witnesses to testify concerning the affairs of the Seventh National Bank. They were the very men who must have been cognizant of those affairs. They testified, and, not merely making statements of such matters as they chose to divulge, in the end they answered all the questions propounded by the district attorney; and the grand jury brought in an indictment against them."

And again:

"It [defendants' contention] merely commands that the party to be accused by indictment shall not be subjected to examination before the grand jury, at least in cases where, as in the case at bar, it is clear as noonday

that the parties thus examined are in imminent peril of indictment, if an indictment is to be found against anybody."

If the danger of indictment was so clearly known to anybody, it was known peculiarly to the defendants, if the allegations of the indictment be accepted as true; for they were in such case the very actors. The grand jury was merely investigating. Knowledge on its part, or that of the United States attorney, came no faster than the witnesses having the information revealed it. As between the grand jury, making progress through the complicated and numerous transactions of a great and busy banking institution, and these defendants, to whom was knowledge more justly ascribable? Was it as clear as noonday to Kimball, Poor, and Rose what the transactions had been; what checks had been drawn by Marquand & Co., by the very hand of Poor; that they had been certified by Rose, under the direction of Kimball; and that at such time the drawer did not have the funds on deposit? The jury knew, and they did not, is the present plea; and they did not refuse to testify because they did not understand that they were in peril of indictment. Such contention is idle on its face, and impairs the merit of their straightforward conduct before the grand jury, when Kimball and Poor placed all their information at its disposal. Cases have undoubtedly arisen where persons have been called to give evidence under such circumstances of ignorance of law, fact, and the occasion of their presence as to amount to misconduct on the part of the grand jury or prosecuting officer in using the same as a basis for indictment, and such instances will arise in the future. Then the courts will meet the facts according to their deserving. But no such condition here exists. The defendants knew the precise inquiry. They were men of affairs. They had opportunity to seek counsel. The jury began in darkness, and came by degrees to the light which, in its view, revealed these defendants as wrongdoers.

This leads to the conclusion that the defendants had full knowledge of the causes of the bank's failure, and in whatever relation they stood to it, and of all the peril which such relation might bring them. A survey of the decisions will reveal the attitude of the courts respecting the general subject under discussion. The defendants refer to authorities where the taking of the evidence of persons afterwards indicted has been condemned. These may be classified as follows: (1) Where a person whose own conduct was specifically under investigation, of which he had not knowledge, was subpœnaed and gave evidence touching matters thereafter the subject of indictment against him. U. S. v. Edgerton (D. C.) 80 Fed. 374, 375. (2) Where a person arrested and imprisoned, charged with the crime of murder, was taken before the grand jury and gave evidence without objection (Boone v. People, 148 Ill. 440, 36 N. E. 99, and People v. Singer, 18 Abb. N. C. 96), where (in the last case) it was deemed immaterial that the district attorney warned the defendant, a woman, not to answer, and refused to ask her questions, leaving the examination to the jury. (3) Where a person charged with an offense was required to attend and testify, presumably knowing that his conduct was a specified subject of investigation. People

v. Haines (Gen. Sess.) 1 N. Y. Supp. 55; State v. Froiseth, 16 Minn. 296 (Gil. 260). But in connection with the last case State v. Hawks, 56 Minn. 129, 57 N. W. 455, should be consulted. (4) Where a person accused of a crime was taken before a grand jury, and, without being informed of his right or of the possibility of his evidence being used against him, testified, and it was ruled that the evidence was not admissible against him on the trial of the indictment. State v. Clifford, 86 Iowa, 550, 53 N. W. 299, 41 Am. St. Rep. 518. This case invokes the rule applicable to proceedings before magistrates.

Before mentioning opposing references it may be observed that none of the cases are applicable to the facts presented in the actions at bar. In the Edgerton Case it is inferable that the witness had no knowledge, nor was he warned, that the investigation related to him. It may be worthy of mention that in the Froiseth Case the witness was rendered by a statute of the state an incompetent witness before the grand jury, except at his own instance, although the decision was placed on the constitutional ground; and in Boone v. People the court used language that affords favorable opportunity for limiting the main holding, if occasion should require, for it is said:

"We do not hold that where one is before the grand jury as a witness, and at that time is not charged with crime, and may incidentally be interrogated about a matter, to which he makes answer, and an indictment afterwards is found against him, would require the indictment to be quashed; nor do we hold that every case where one is before the grand jury as a witness, and interrogated about a matter for which he may afterward be indicted, would be of itself sufficient cause to quash the indictment. But in this case it does not appear that the grand jury examined any other witnesses, nor does it appear the indictment was not found on the evidence of the defendant alone. No affidavits are filed by the state's attorney on that question; and where, as here, the defendant charged with crime is taken from the jail and before the grand jury, and interrogated about the matter with which he is charged with crime. such an error must be held fatal to quash the indictment."

There can be no question of the correctness of this decision, nor that of People v. Singer, supra; but there is value in noticing the precise reason, and that is that the status of the prisoner in each case was such that he could not go before the grand jury as a free man, but he was taken from prison to meet a specific accusation for murder. The constitutional provision is aimed against compulsory incriminating evidence, and in the Boone and Singer Cases the very condition of the witnesses presumed compulsion. It will not be denied that a man or woman, taken from jail to the grand jury room, perhaps brought to the door in chains, and interrogated by the prosecuting attorney and the jurymen, is not a free agent to choose whether he will or will not answer. Accused, arrested, imprisoned, moved by a will not his own, unprotected by advice, and exposed to the severities of a prosecution conducted ex parte, he is not conditioned to assert his right to refuse evidence with that spirit of independence which the law contemplates. But the case of the present defendants has no resemblance to such deprivation of liberty and personal selection of action.

The attorneys for the United States refer for support to People v. Lauder, 82 Mich. 109, 46 N. W. 956, State v. Donelon, 45 La. Ann.

744, 12 South. 922, U. S. v. Brown, 1 Sawy. 531, Fed. Cas. No. 14,671, and Thomp. & M. Juries, § 643. In State v. Donelon the facts were similar and the holding contrary to that in People v. Singer, supra; but the tendency of the doctrine stated in the citations is illustrated by the holding in People v. Lauder, where a person, pursuant to a subpœna, attended before a grand jury, gave evidence, was indicted, and upon these facts pleaded that the indictment was invalid. One member of the court dissented from the prevailing opinion, from which the following extract is made:

"And, first, it may be premised that being subpœnaed and appearing before the grand jury was not a violation of his constitutional right, nor being sworn before that body, nor testifying upon any matter that did not criminate himself. All these the law compelled him to do under pains and penalties. But the law did not compel him to give testimony that would criminate himself. The fundamental law expressly declared that he should not be compelled to do so. It was, therefore, a personal privilege, and Mr. Lauder could claim it or not, as he chose. If he gave such criminating testimony voluntarily, it is doubtful if it could be used against him upon the trial. If it was not voluntarily given, it could not be used against him upon the trial. In all cases, where a person's privilege exists for a witness to testify or not, if such witness does testify without objection, he will be deemed to have done so voluntarily. * * * The real complaint made by the plea is that Lauder was subpœnaed to appear before the grand jury, and he appeared in obedience thereto; that he was sworn, was interrogated, and answered all questions. He states that all this was done without having the aid and advice of counsel, and, 'because he did not have the assistance of counsel to bring out all the facts and circumstances of the case,' he testified to the facts material and necessary to prove the truth of the charges. As he was not upon trial for any offense, no exception can be taken to his not having the assistance of counsel; and, as he made no objection to testifying on account of privilege, I do not see why that should be appealed to as a ground for quashing the indictment. * * * A party may waive personal rights, although secured to him by law or by the constitution. He may waive the right to a preliminary examination upon a criminal charge."

In conclusion, it should be said that grand juries are privileged to seek for information from persons most likely to be conversant with the matter under investigation, and are not compelled warily and assiduously to shun such persons, lest it happen that an indictment should in the end be found against them. The theory of limiting grand juries to questioning persons disconnected with a ruined bank as to the cause thereof, in timorous expectation that a less remote search might chance to bring the persons guiltily concerned into the presence and under the examination of the jury, is not consonant with that vigor of inquiry that such exigencies demand. The persons whose duties converged at such bank would be those who should know, and it is of these persons that an investigating grand jury should inquire, not of those who, isolated from its affairs, would be presumed to have no knowledge. While much is due to the conservation of personal rights, the administration of justice should not be fettered by a sentimentality that would paralyze efficient action. The status of persons arrested, legally charged with crime, or objects of complaint therefor before a court, officer, or grand jury, may justify a presumption that such persons gave evidence under compulsion; but witnesses otherwise competent, who are subject to none

of these disadvantages, should be exposed to the usual summons to aid in the investigation of offenders, and to the common responsibility and peril of knowing what incriminating evidence they should withhold. What should be done in cases, if such should arise, where there is ignorance amounting to helplessness, or unconsciousness of the matter under investigation resulting in a denial of the opportunity for self-exemption, is an important consideration, unconnected with the matter at bar.

The general rules applicable to witnesses have been stated and applied to Kimball and Poor; but the last inquiry is, does the case of Rose show that he, at least, was the subject of the compulsion forbidden by the constitution as herein interpreted? To the end that the history of his treatment before the grand jury might be known more definitely than appeared from his own affidavit, the stenographic minutes have been directed to be added to the record. They show that, upon being sworn, Rose, after giving his address, and stating that he had been the paying teller of the Seventh National Bank for several years, identified the books of the bank, and thereupon was asked this question: "Did you make entries in any of those books?" To this the witness replied:

"Counsel has advised me not to answer any questions in regard to the affairs of the Seventh National Bank."

Thereupon the United States attorney said:

"Now, Mr. Rose, let me say to you, first, you are not bound to answer any questions that would tend to criminate yourself, but that must be on that ground; otherwise, if we ask you to appear again, should you decline to answer on general grounds, but not on that, we can take the record and certify it to the court, and you would be compelled to answer by the court. Now, whenever any question is put to you that would tend to criminate you, even in your opinion, in which you may be wrong as to that, it is a matter for you to decide. That is a perfectly good objection. Furthermore than that, I may say that under the statute (section 860) anything that you would say here voluntarily never could be used against you in any criminal prosecution. Now, we want simply, fairly, and justly to get at the facts in this case. You must be the judge of whether you will answer to this grand jury questions put to you, or whether you will have a proceeding brought against you and be brought up for contempt in refusing to answer. You must be guided by your own judgment and by the advice of your counsel."

Thereafter in reply to questions the witness stated that he declined to answer on advice of counsel, naming him, and thereupon the district attorney said:

"Now, I repeat the question I put to you: Did you make entries in any of these books? Now, if in your judgment the answer to that question would tend to criminate you, or subject you to criminal prosecution, you are not bound to answer. If it will not, it is your duty to answer, and give this jury full information. I will state further, Mr. Rose, we want to be absolutely fair and kindly, and take no advantage of anybody here. If you feel that you are in a dangerous position, or a perilous one, I will adjourn your examination until you can have opportunity for a further consultation with your counsel, and allow you to take that further time, and I will call you again before the grand jury. I will take no advantage or press you unduly. We simply want to get at the facts. You understand that I stated to you very clearly that anything that you stated here could not be used against you in any criminal prosecution. In that the statute

entirely protects you, and your own counsel will advise you to that effect. Now, you must be the judge, and take the responsibility."

The witness stated, in effect, that he thought the question would tend to incriminate him, and thereupon he was not compelled to answer the question, and did not answer it at any time during the examination. The district attorney repeated the assurance that the law gave him the right to judge whether he would raise the objection, and added:

"When you claim that privilege under the constitution, it protects you in that right, and we cannot trespass upon it."

The witness having declined to answer the question, the district attorney said:

"In the performance of my duty I must ask you certain questions, and you should conscientiously, under oath, answer the questions or claim protection of your privilege."

Thereupon the witness continued to answer or not to answer questions according to his own free will, without the slightest evidence of compulsion. The evidence that he did give was of a general nature, relating to the usual duties of a paying teller and general courses of business, without material reference to his connection with the checks upon which the indictment is based. The record, on account of the absolute fairness observed toward the witness, dispels instantly any doubt raised by his affidavit, which in its statement of facts tended to differentiate the position of Rose from that of Kimball and Poor.

The other questions to which counsel for defendants have called attention have been examined, and furnish no ground for the relief asked. After careful examination and study of the defendants' brief, in which every phase of the questions here involved is presented, with exhaustive reference to authorities, it is decided that the contention of the government, so far as pertinent to the conclusions here reached, should be sustained.

The motion to quash the indictments is denied, as is the motion to inspect the minutes of the grand jury, other than the part relating to the evidence of Rose.