THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant and Cross-Appellee, v. JAMES BARTON *et al.*, Defendants (Beverly Delaney, Defendant-Appellee and Cross-Appellant).

Fifth District No. 5—86—0498

Opinion filed November 1, 1989.

Bruce D. Locher, Special State's Attorney, of Springfield (Kenneth R. Boyle, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Tyler J. Bateman, of Alton, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

This cause is on appeal after a dismissal of an indictment against the defendant, Beverly Delaney, by the trial judge for prosecutorial misconduct.

The defendant was indicted on two counts of bribery and one count of perjury in a 46-count indictment that was the result of an investigation into alleged misconduct by the Madison County supervisor of assessments. The defendant was accused of assisting her employer, Robert "Pat" Quinn, in bribing the supervisor of assessments, James Barton, by paying $200 to the James Barton Defense Fund (a fund that was established to help Barton defray the cost of defending against a prior indictment) with the intent to influence Barton into reducing Quinn's real estate taxes and then committing perjury before the grand jury by denying that Quinn had repaid her.

The hearing on the defendant's motion to dismiss along with other motions lasted seven days. Basically, the evidence that pertained to the defendant can be separated into three segments. The first part consisted of evidence attempting to show that Don Weber, the State's Attorney of Madison County, was guilty of numerous unethical and possibly criminal acts. The second area consisted of evidence attempting to prove that the special State's Attorney appointed by the court was not independent of Weber. The final segment of evidence consisted of testimony and exhibits showing that the special State's Attorney deliberately had the court reporter read an edited version of the defendant's testimony before a prior grand jury that gave a different meaning as to what the defendant was really saying.

In 1984, an election year for the office of State's Attorney of Madison County, Don Weber was the Republican incumbent seeking retention. Weber and the United States District Attorney were conducting a joint investigation of the supervisor of assessments' office with the assistant State's Attorney, Keith Jensen, being primarily in charge of the investigation for Weber's office. There suddenly developed leaks to the press and to the Republican county chairman of confidential wiretap evidence that could only have come from Weber. The U.S. Attorney finally had enough and withdrew from the investigation.

Meanwhile, Jensen went to circuit judge P.J. O'Neill and told him that he was concerned because Weber was leaking matters before the grand jury to the press and that Weber had ordered him to obtain indictments before the primary election so that he would look good in

spite of the lack of sufficient evidence for probable cause at that time. In fact, Weber told Jensen to find him a Republican officeholder to indict because it would make him look impartial to the public. Weber then told Jensen to hold up on the indictments because others had convinced him that it would appear too political to have the grand jury return indictments so close to the primary elections and that he had merely been trying to send false signals to the U.S. Attorney, hoping that he would take action against the Democratic officeholders.

The grand jury then requested an audience with Judge O'Neill as they were concerned with Weber's political maneuverings and the criticism leveled against Weber by this court in the case of *People v. Barton* (1984), 122 Ill. App. 3d 1079, 462 N.E.2d 538, *cert. denied* (1985), 469 U.S. 1213, 84 L. Ed. 2d 332, 105 S. Ct. 1185. Judge O'Neill, acting upon the wishes of the grand jury, entered a sealed order barring Weber from appearing before the grand jury in the matters under investigation and directing Jensen to continue with the investigation.

Weber was upset by the order and filed a motion to vacate the order making the matter public. He also at this time made threats to indict Judge O'Neill. Ultimately, Judge Dennis Cashman of the Eighth Judicial Circuit was appointed by the Illinois Supreme Court to hear the motion.

On May 9, 1984, Weber, Judge O'Neill, and Keith Jensen agreed and stipulated that a special prosecutor be appointed who was to be independent of Weber. Weber suggested that Bruce Locher of Springfield, Illinois, be appointed, as he had no close ties with Locher and Locher had a good reputation. Judge O'Neill agreed to the appointment as he was advised that Locher was a reputable attorney. Judge Cashman agreed to the appointment although he did not personally know Locher. Judge Cashman stated in his order of appointment, however, that said "Special State's Attorney, in order to avoid any appearance of impropriety, should be an attorney independent of the Office of State's Attorney of Madison County." It was also agreed at this time that Locher was to be appointed to prosecute pending cases against James Barton and a case against one Walter Greathouse, a member of the Madison County Zoning Board of Appeals.

Meanwhile, "Zeke" Smith, assistant State's Attorney in the civil division of the Madison County State's Attorney's office, decided that he could be instrumental in settling all of the problems in Madison County. Smith contacted Ben Allen, an attorney who had contacts with some of the persons being investigated and the attorney of James Barton, for the purpose of arranging a meeting with Weber.

Weber, himself, had been indicted, and an appeal from a dismissal of the indictment was pending in this court. The parties met June 21, 1984, and agreed that Weber would dismiss the Greathouse case as a "good faith gesture," Allen would contact Barton's attorney to see if Barton would plead to some misdemeanors and resign from office, Weber would have Locher not prosecute attorneys Merle Bassett and Robert "Pat" Quinn but instead forward the matter to the Attorney Registration and Disciplinary Commission, and, finally, Allen was to approach Paul Verticchio, special prosecutor on Weber's case, to see if he would drop the appeal.

Weber telephoned Locher, but failed to reach him. Later Weber's secretary came into the meeting room and said that Locher was on the phone. Weber then spoke with Locher, but neither could remember what was said. However, Locher had told Chief Judge Matoesian previously that he would complete his investigation and need of the grand jury in June or July. The grand jury was not called until late August 1984. Further, "Zeke" Smith obtained the dismissal of the Greathouse case on July 30, 1984, even though he had had nothing to do with the case prior to that date. Although Weber and Locher both testified that they were upset about the dismissal, neither did anything about vacating the order or disciplining Smith.

Allen, after learning of the dismissal of Greathouse, approached Verticchio in late August or early September about dismissing the Weber appeal, but Verticchio said that the courts should resolve the matters. Allen advised Weber that he had not been able to effectuate the dismissal, and soon afterwards, the grand jury met and indicted several of the parties discussed in the June 21 meeting. Robert "Pat" Quinn and the defendant were not indicted by this grand jury.

Locher had only a brief 15- to 20-minute meeting with Jensen after his appointment, even though Jensen had been the chief prosecutor in the investigation until Locher's appointment. From 1984 to 1986 Locher made 52 telephone calls to Weber's home, Weber's father's house and the State's Attorney's office prior to December 1984. Weber could not produce the State's Attorney's telephone bills from January to December 1984, although both Weber and Locher admitted that Weber had made calls to Locher expressing his opinion about matters related to the investigation. Both Weber and Locher admitted to at least 10 personal meetings. As late as 1986, Weber was personally delivering subpoenas to the sheriff for Locher. Even though Weber and Locher admit to having continuous contact and even though Locher billed Madison County for some of those meetings with Weber's review and approval of the billing, Locher could not

remember what was discussed. Weber's memory was only slightly better than Locher's memory.

After the indictments were returned by the April to October grand jury, Locher advised the chief judge that he was through investigating and ready to start prosecuting. Weber, meanwhile, had been having lunch with the foreman of the grand jury and just so happened to place a $792 order for envelopes with the foreman's printing shop. The grand jury issued a glowing commendation about Weber and his office before ending its term just prior to the general election.

At 3 a.m. on November 6, 1984, it became apparent that Weber had failed to be reelected. Between 9:30 and 10 a.m. on the same day, the grand jury bailiff reported that Locher had called and said that he wanted to call the grand jury again before Weber left office. The chief judge refused to call the grand jury as he felt that since a new State's Attorney had been elected, there would not be a need of a special State's Attorney, which would end the high cost of the prosecution. Locher was able to get Judge Cashman to call another grand jury, which returned the same indictments against the same defendants as the previous grand jury had, apparently to avoid any charges of tampering with the grand jury by Weber.

This grand jury also indicted Robert "Pat" Quinn and his secretary, the defendant. There was some evidence that Quinn had worked hard to defeat Weber in the election and that Weber felt that the defendant had been critical of him and had worked against him.

In order to indict the defendant, Locher called the court reporter, Melody Kerbs, who had transcribed the testimony of the defendant before the March 15, 1984, grand jury. Kerbs testified that Locher gave her a copy of the transcript and instructed her to respond only to those sections that were marked. Kerbs complied with Locher's instructions and only read to the grand jury the excerpted portions. The grand jury was not advised that portions of the defendant's testimony were being omitted. Further, it would not have taken more than three to five minutes to read all of the defendant's testimony.

In questioning the defendant about the James Barton Defense Fund by Jensen, the following questions and answers were made:

"Q. Did you ever talk to your employer about the defense fund?

A. Yes, in a way.

Q. Would you tell us in what way you did?

A. I—Just what I told you. I heard that there was a defense fund. I asked Mr. Quinn if he knew anything about it. He said he had heard about it. I said, 'I would like to make a contribu-

tion, but I don't know how to go about it,' and he said if I wanted to make a contribution to give him the check and he would see that it got to the right party.

Q. How did you know to make it out to the James Barton Defense Fund?

A. What else would you make it out to?''

Locher then had the court reporter skip the following questions and answers:

"Q. You don't remember ever hearing specifically about a fund?

All you remember is that there was some talk, but you never knew there was a defense fund?

A. No, not really.

Q. Then why did you make it out to the defense fund?

A. What would I make it out to?

Q. Jim Barton?

A. I don't know Jim Barton.

Q. Did you know the Jim Barton Defense Fund?

A. No.

Q. Then why did you make it out to the Jim Barton Defense Fund?

A. Because I had heard there was a Jim Barton Defense Fund and it seemed to be logical.

Q. Have you ever heard of any other defense fund for criminal clients like that, or people who are targets of investigation?

A. I am sure I have, but I can't give you a specific example. I have made checks out before to other funds simply because, you know, that was—they are collecting money for something, so it is a fund.

Q. What type of funds have you make [sic] out checks for?

A. Well, there was some gentlemen [sic] who had a brain tumor and they were trying to get money for the surgery, so I made out a check because I felt he was a young man that deserved a chance, so I sent money to the fund.

Q. Was this to the man himself or to someone that knew about it?

A. No, I think the Salvation, if I remember, the Salvation Army was collecting the funds for it. He was from Bethalto or Cottage Hills or somewhere.''

Locher then had Kerbs read the following questions and answers without mentioning to the grand jury anything about the Salvation Army or a man with a brain tumor:

"Q. Did someone come and ask you for a donation?
A. No, I simply heard about it.
Q. Did anyone reimburse you for that $200.00?
A. No. Who would reimburse me?
Q. I am asking you.
A. No."

Even if you construe the scenario most favorably for the State, it is confusing as to whether the defendant was referring to her donation to the James Barton Defense Fund or to her donation to the Salvation Army. Most likely, however, it appears that the defendant was referring to her donation to the Salvation Army.

There was more evidence introduced of motions attacking the integrity of the judges in Madison County, pleadings before the Illinois Supreme Court questioning the good faith of the judiciary, and even a request and short investigation of some of the judges' financial reports with releases made to the press. Judge O'Neill characterized the special prosecutor's allegations as "pure Weber." Even worse, Locher admitted that some of the allegations, including the pleadings before the Illinois Supreme Court, were not correct. Since all of these events occurred after the indictment of the defendant, this evidence would be relevant only to show the continuous ties between Weber and Locher.

■ There is an old adage that "bad cases make bad law." The danger that is prevalent in this case is that it might serve as precedent for defense counsel to attempt to defend their clients by trying the State's Attorney. If this type of practice were to become widespread, it could have disastrous consequences for the judicial system, as evidenced by the seven-day trial of the prosecutor in this case. We cannot afford the delay in our criminal justice system by trying the prosecutor, nor should we divert our attention from judging the guilt or innocence of the defendant to judging the conduct of the prosecutor, except in very limited situations. *People ex rel. Sears v. Romiti* (1972), 50 Ill. 2d 51, 277 N.E.2d 705.

■ One of the limited situations in which we do examine and judge the conduct of the State's Attorney is in his or her presentation of the case before the grand jury. It is well established that:

"[T]he grand jury is an integral part of the trial court and that the court, in its inherent supervisory power over the grand jury, has jurisdiction to order and examine transcripts of grand jury proceedings to determine if there has been prosecutorial misconduct. *People v. Sears* (1971), 49 Ill. 2d 14, 35-36[, 276 N.E.2d 322]; *accord Hughes v. Kiley* (1977), 67 Ill. 2d 261, 267[, 367 N.E.2d 700]." (*People v. Linzy* (1979), 78 Ill. 2d 106, 109,

398 N.E.2d 1, 2.)

However, the court is limited in the scope of its inquiry to the record and transcripts of the proceedings before the grand jury and cannot "justify the use of affidavits or testimony of grand jurors to show misconduct during grand jury proceedings." *People ex rel. Sears v. Romiti* (1972), 50 Ill. 2d 51, 59, 277 N.E.2d 705, 709.

■ "This misconduct of the prosecutor does not justify the punishing of society." *United States v. Stanford* (7th Cir. 1978), 589 F.2d 285, 299. This court stated previously about the same State's Attorney, Don Weber:

> "While we applaud the vigorous prosecution of crime, we are appalled when, as here, a prosecutor becomes a persecutor. If the conduct of a prosecutor is the result of any motive other than the fair and impartial prosecution of alleged crimes, such conduct must not be tolerated by a court." (*People v. Barton* (1984), 122 Ill. App. 3d 1079, 1084, 462 N.E.2d 538, 543, *cert. denied* (1985), 469 U.S. 1213, 84 L. Ed. 2d 332, 105 S. Ct. 1185.)

This court went on to describe Weber's conduct as "wholly unjustified and inappropriate," "appalling," and "reprehensible" to which we can easily add such adjectives as outrageous, totally unacceptable, unethical, and disgraceful. Still, this court did not dismiss the indictment in *Barton* for Weber's pretrial misconduct.

■ The test is whether or not "there has been a clear denial of due process." But the power to dismiss an indictment should be utilized with restraint and only be exercised if the violation is clear and can be ascertained with certainty. *People v. Lawson* (1977), 67 Ill. 2d 449, 455-56, 367 N.E.2d 1244, 1246-47.

■ The trial court was clearly justified in finding from the evidence that the indictment of the defendant was for political and vindictive reasons. The special prosecutor's "cut and paste job" on the transcript in presenting the defendant's prior testimony before another grand jury, his incredible loss of memory whenever he was questioned about his dealings with Weber, his participation in "Zeke" Smith's scheme to extricate Weber from his indictment, and his sudden decision to indict the defendant within hours after learning of Weber's defeat explain his motivation in obtaining the indictment of the defendant.

It should be made clear, however, that in spite of the misconduct and unethical acts of Weber and the special State's Attorney, a dismissal of the indictment would not be justified, if the special prosecutor had not misled the grand jury. The only relevance that most of the

evidence in this case has goes only toward showing that the misleading of the grand jury by the special prosecutor was not accidental or a mistake. The cases are consistent that the due process rights of a defendant are violated, if the grand jury is deliberately or intentionally misled by the prosecutor. *United States v. Basurto* (9th Cir. 1974), 497 F.2d 781; *United States v. Estepa* (2d Cir. 1972), 471 F.2d 1132; *People v. Linzy* (1979), 78 Ill. 2d 106, 398 N.E.2d 1; *People v. Creque* (1978), 72 Ill. 2d 515, 382 N.E.2d 793.

The judgment of the trial court in dismissing the indictment is affirmed.

In view of our disposition of the foregoing issues, we need not address the issue raised in defendant's cross-appeal.

Affirmed.

LEWIS and KARMEIER,* JJ., concur.

---

*Justice Karmeier replaces Justice Karns, who retired from the bench after this case was taken under advisement.