(No. 66398.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appel-
lee, v. J.H., A Minor, Appellant.

*Opinion filed April 18, 1990.*

3

MORAN, C.J., joined by CLARK, J., dissenting.

Paul P. Biebel, Jr., and Randolph N. Stone, Public Defenders, of Chicago (Alison Edwards, Assistant Defender, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Cecil A. Partee, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Inge Fryklund and Kim A. Novi, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CALVO delivered the opinion of the court:

The defendant, J.H., was charged by indictment with the murder of Frederick Harris. On the defendant's mo-

tion, the circuit court dismissed the indictment because of prosecutorial misconduct. On appeal, a majority of the appellate court reversed and remanded the cause to the circuit court (164 Ill. App. 3d 718). We granted the defendant's petition for leave to appeal (107 Ill. 2d R. 315).

The record reveals that on August 18, 1984, at approximately 3 a.m., defendant, J.H., age 15, was at the Roosevelt Road subway station on 1200 South State Street in Chicago, Illinois. Defendant had just come from a party at an establishment called the "Candy Store" at 13th and Michigan. Several of defendant's friends, Louis Marshall, G.C., Vincent Stepter, Brian Hoard, and three individuals known as Milfred, Ant, and Curry, were also at the station when a southbound train arrived. Three people, one of whom was Frederick Harris, stepped off the train and were heading toward the stairway when G.C. approached Harris. The two shook hands, spoke a few words, and then G.C. yelled, "[W]e got us some." G.C. proceeded to strike Harris in the head, and after doing so, he, defendant, and several of the other youths began chasing Harris and his two companions. Harris' friends ran up the stairs in the station, but Harris continued running down the platform with G.C. and defendant in pursuit.

When Harris reached the end of the platform and attempted to climb onto the tracks, G.C. kicked Harris in the back. Consequently, Harris fell onto the third rail of the tracks, where he was electrocuted and subsequently run over by an oncoming train. Shortly thereafter, the police arrived and a murder investigation ensued.

The following facts were disclosed at the hearing on defendant's motion to dismiss the indictment. On two separate occasions on August 19, the day after the incident, police officers went to the apartment of defendant's mother, Barbara Humphrey. Ms. Humphrey testi-

fied that on their first visit, the officers told her they wanted to question defendant about some "video games." She informed the officers defendant did not reside with her. When different officers contacted her later that evening, she repeated that defendant no longer lived with her, but lived with his sister and legal guardian, Torra Humphrey. Ms. Humphrey testified the officers assured her, "It was nothing *** to get alarmed about, they just wanted to ask him a few questions." Then, the officers performed a consensual search of her apartment.

During this second visit, the police officers encountered Gad Israel, defendant's father, who later testified the officers told him they wanted defendant "for something that happened downtown." They also told Israel that "[t]hey wanted him [defendant] to be a witness about something," but did not mention what that "something" was.

The following morning, defendant, his mother, and his father went to police headquarters at 51st Street and Wentworth Avenue. According to Israel, after telling one of the officers that he had to go to work, he was told that he could "go ahead on," because they would be at the station all day. The officer also told Israel that the police wanted to question defendant as a "witness" regarding "an incident at the el." Israel left the station around noon and went to work.

Ms. Humphrey remained at the station, and at approximately 1:30 p.m., she and defendant had a conversation with a policeman, a youth officer, and an assistant State's Attorney. They told her they only wanted to talk to defendant as a witness to a murder at the subway, and that afterward he could go home. Ms. Humphrey believed defendant was not under arrest at that time. She told the three men "it would be okay" for her son to testify before the grand jury.

Before leaving the station at 7 p.m., Ms. Humphrey asked several times about taking defendant home. Initially, she was told defendant could not go home because he had to wait for the arrival of an assistant State's Attorney. Later, she was told he could not leave because he had to be in court the next day to give the statement he had given the authorities, but he would be home "tomorrow." Ms. Humphrey did not call an attorney since she "didn't need a lawyer, it wasn't nothing he [defendant] had done."

Clifford Clark, defendant's counselor from the Unified Delinquency Intervention Services for the Juvenile Court, testified that he went to the police station in the early afternoon on August 20, at the request of defendant's mother. A police officer told Clark defendant was there "only for some questioning." At 3 p.m., Clark spoke to defendant in the presence of a female youth officer and two detectives, and then he spoke to defendant alone. After their conversation, Clark waited an hour until he spoke to a "sheriff" about defendant's release, but according to Clark, the sheriff "kept putting *** [him] off." Prior to Clark's leaving the station at 4 or 4:30 p.m., the same officer told him that defendant would be released "as soon as they finished processing."

The following afternoon, August 21, Clark went to the criminal courts building at 26th and California. When he arrived, he saw the defendant alone in a hallway outside the grand jury room, not handcuffed, and acting "as if he'd been playing basketball." While at the courthouse, Clark was approached by two people. The first individual inquired as to Clark's relationship with defendant. The second person told Clark defendant was at the courthouse for questioning and "somebody" would take defendant home.

Torra Humphrey, defendant's sister and legal guardian, testified that she too went to the criminal courts

building on August 21 at 9:30 a.m. Upon her arrival, she observed defendant with another young boy in the snack shop accompanied by a person whom she believed to be a police officer. The man told her defendant had to make a statement and afterward would be ready to go home. The four then left the snack shop and went upstairs to the grand jury room. At approximately 2 p.m., Torra, defendant, and Clark had a discussion with an assistant State's Attorney during which the attorney told defendant "to tell him his story" and he would help defendant. The attorney also told defendant that defendant could leave after he told his story. Torra left the courthouse at approximately 2:30 p.m. to go to work.

James Epstein, assistant public defender and counsel for G.C., testified that he interviewed defendant at 11 a.m. on August 21. Clark and Assistant Public Defender Tim Ackerman were present. Epstein introduced himself to defendant and Clark, showed them his identification card, and told them he was G.C.'s attorney. Defendant told Epstein that he did not have a lawyer, that he was merely a witness, and that he would be going home after testifying before the grand jury. Defendant proceeded to describe the events of August 18 at the subway station. He never mentioned his participation in the chase and stated he tried to help the victim off of the tracks.

Assistant State's Attorney John Romano testified that he received a call on August 21, 1984, concerning the Harris murder, and reported to the courthouse at 26th and California. When he arrived, he discussed the case for 30 to 45 minutes with two detectives and read the police reports. He learned that G.C. was in custody and the only individual charged in the case. Romano proceeded to interview five witnesses, including defendant.

Prior to Romano's interviewing defendant, the detectives informed him that defendant had been on the "el" platform at the time of the murder. Defendant had told

police and another assistant State's Attorney the pre-
vious day that he was present when the incident oc-
curred but, for the most part, he observed it from a
bench. Defendant did not mention that he chased the vic-
tim.

Romano spoke to defendant at approximately 1 p.m.
with two detectives present. After asking some prelimi-
nary questions, Romano gave defendant *Miranda* warn-
ings and defendant waived his rights. According to Ro-
mano, defendant told basically the same story he had
told the police and the other assistant State's Attorney.
Romano then told defendant the other witnesses had re-
lated a different story and admonished defendant to tell
the truth before testifying in front of the grand jury. As
a result, defendant gave a different version of what hap-
pened on August 18, which was substantially the same
as his testimony before the grand jury.

Defendant testified before the grand jury at 2 p.m.
that same afternoon. Before defendant was sworn in,
Romano informed the grand jury that the instant cause
was a "John Doe for information only regarding the in-
vestigation of the homicide of Mr. Frederick Harris." He
asked the grand jury "to pay close attention to the testi-
mony of the witnesses, as [the State] will be seeking
charges."

The transcript from the grand jury proceedings re-
veals that Romano first questioned defendant about his
age and his being advised of his constitutional rights in
their prior interview. Defendant also admitted that he
was given his constitutional rights before he spoke to the
police and an assistant State's Attorney on August 20,
1984, and that no threats or promises were made to him.
Again, Romano advised defendant of his *Miranda*
rights, which defendant waived. Defendant then pro-
ceeded to describe the events that transpired on the sub-
way platform, stating that he participated in the chase

with the intent of injuring Harris. Defendant explained that he had told a different story to the authorities on the previous day because he "didn't want to get involved in it."

Four other eyewitnesses also testified before the grand jury and described the murder in the same way as defendant. Each observed defendant and G.C. chasing Harris. Following their testimony, Romano informed the grand jury he was seeking a true bill of indictment against G.C. and defendant for the murder of Frederick Harris. After deliberation, the grand jury indicted them both.

Defendant moved to dismiss the indictment, alleging that the "course of conduct leading up to defendant's appearance before the Grand Jury was clearly calculated police and prosecutorial misconduct and overreaching" resulting in a denial of due process. The circuit court granted defendant's motion to dismiss, reasoning that the assistant State's Attorney secretly intended to indict defendant once defendant told his inculpatory story and that the assistant State's Attorney's failure to inform defendant of this intention violated defendant's right to due process because he used the grand jury "like the Inquisition."

The appellate court, one justice dissenting, reversed the judgment of the circuit court, acknowledging that a circuit court may dismiss an indictment in certain instances because of prosecutorial misconduct, but holding that (1) this defendant's allegations of coercive detention, entailing fourth, fifth, and sixth amendment violations, did not constitute sufficient justification for dismissal of the indictment, (2) defendant had no due process right to be informed he was a target for indictment, and (3) the circuit court had no authority to inquire into the "adequacy" of evidence presented to the grand jury, so long as there was "some" evidence rela-

tive to the charge. (164 Ill. App. 3d at 724-29.) We affirm the judgment of the appellate court. We do not believe dismissal of the indictment is an appropriate remedy in this case.

Inasmuch as the grand jury does not finally adjudicate guilt or innocence, it has traditionally been allowed to pursue its investigation unrestrained by the technical evidentiary and procedural restrictions applicable to a criminal trial. Generally speaking, "the validity of an indictment is not affected by the character of the evidence considered." (*United States v. Calandra* (1974), 414 U.S. 338, 343-45, 38 L. Ed. 2d 561, 568-69, 94 S. Ct. 613, 617-18.) In *Calandra*, the Supreme Court declined to extend the exclusionary rule to grand jury proceedings, holding such an "extension of the exclusionary rule would seriously impede the grand jury." (*Calandra*, 414 U.S. at 349, 38 L. Ed. 2d at 572, 94 S. Ct. at 620.) The Court reasoned:

"Permitting witnesses to invoke the exclusionary rule before a grand jury would precipitate adjudication of issues hitherto reserved for the trial on the merits and would delay and disrupt grand jury proceedings. Suppression hearings would halt the orderly progress of an investigation and might necessitate extended litigation of issues only tangentially related to the grand jury's primary objective. The probable result would be 'protracted interruption of grand jury proceedings,' [citation] effectively transforming them into preliminary trials on the merits. In some cases the delay might be fatal to the enforcement of the criminal law." (*Calandra*, 414 U.S. at 349-50, 38 L. Ed. 2d at 572, 94 S. Ct. at 620-21.)

The Court concluded the potential injury to the role and function of the grand jury was not outweighed by the benefits of applying the exclusionary rule in the context of grand jury proceedings:

"Any incremental deterrent effect which might be achieved by extending the rule to grand jury proceedings

is uncertain at best. Whatever deterrence of police misconduct may result from the exclusion of illegally seized evidence from criminal trials, it is unrealistic to assume that application of the rule to grand jury proceedings would significantly further that goal. Such an extension would deter only police investigation consciously directed toward the discovery of evidence solely for use in a grand jury investigation. The incentive to disregard the requirement of the Fourth Amendment solely to obtain an indictment from a grand jury is substantially negated by the inadmissibility of the illegally seized evidence in a subsequent criminal prosecution of the search victim. For the most part, a prosecutor would be unlikely to request an indictment where a conviction could not be obtained. We therefore decline to embrace a view that would achieve a speculative and undoubtedly minimal advance in the deterrence of police misconduct at the expense of substantially impeding the role of the grand jury." *Calandra*, 414 U.S. at 351-52, 38 L. Ed. 2d at 573, 94 S. Ct. at 621-22.

Clearly, the exclusionary rule does not bar a grand jury's consideration of evidence illegally obtained, and use of such evidence does not, absent egregious prosecutorial misconduct, warrant dismissal of an indictment, particularly where, as here, there was other probative, unobjectionable evidence presented to the grand jury. Even if we assume law enforcement officials did violate defendant's fourth, fifth or sixth amendment rights in the process of procuring defendant's grand jury testimony, given the facts of this case, defendant would at most be entitled to suppress the evidence and its fruits if they were sought to be used against him at trial; his remedy does not extend to barring the prosecution altogether. (*United States v. Morrison* (1981), 449 U.S. 361, 365-66, 66 L. Ed. 2d 564, 568-69, 101 S. Ct. 665, 668-69; *United States v. Blue* (1966), 384 U.S. 251, 255, 16 L. Ed. 2d 510, 514-15, 86 S. Ct. 1416, 1419; *United States v. Tapp* (5th Cir. 1987), 812 F.2d 177, 178-79; *People v. Barton*

(1984), 122 Ill. App. 3d 1079, 1084.) There is no need to transform grand jury proceedings into a "kind of preliminary trial" (*Costello v. United States* (1956), 350 U.S. 359, 363, 100 L. Ed. 397, 402, 76 S. Ct. 406, 408) in order to protect defendant's rights where suppression of evidence prior to trial is just as effective. The most important protection for an accused in our system of law is a fair trial itself. *People v. Creque* (1978), 72 Ill. 2d 515, 527.

Having determined that the grand jury could consider defendant's testimony, and that technical evidentiary and procedural restrictions do not apply to grand jury deliberations, we must now consider whether the conduct of the prosecutor warranted dismissal of the indictment. Defendant readily acknowledges, "No Illinois case to date dealing with prosecutorial misconduct has found denial of due process established with requisite certainty to warrant dismissal of an indictment" and "no case since *Boone v. The People* (1894), 148 Ill. 440, 36 N.E. 99 has found fundamental perversion of the grand jury process itself." Even *Bank of Nova Scotia v. United States* (1988), 487 U.S. 250, 263, 101 L. Ed. 2d 228, 243, 108 S. Ct. 2369, 2378, upon which defendant places considerable reliance, suggests that prosecutorial misconduct can usually be "remedied adequately by means other than dismissal" which "allow the court to focus on the culpable individual rather than granting a windfall to the unprejudiced defendant." Nonetheless, several decisions of this court and other courts indicate prosecutorial misconduct may warrant dismissal of an indictment (*People v. Rodgers* (1982), 92 Ill. 2d 283, 287) where defendant's due process rights are violated such that his right to a fair trial is prejudiced (*People v. Lawson* (1977), 67 Ill. 2d 449, 456-58 (addressing, but not finding, prejudicial pre-indictment delay)) or where the prosecutor's conduct in some way undermines the integrity of the judicial pro-

cess (*Creque*, 72 Ill. 2d at 526) as manifested in grand jury proceedings. Some cases suggest the latter *may* occur where a prosecutor deliberately or intentionally misleads the grand jury to the prejudice of the defendant (*Nova Scotia*, 487 U.S. at 261, 101 L. Ed. 2d at 241, 108 S. Ct. at 2377; *Creque*, 72 Ill. 2d at 523-24; *People v. Barton* (1989), 190 Ill. App. 3d 701, 709).

We fail to see how defendant's right to a fair trial could be prejudiced due to prosecutorial misconduct where suppression of the evidence, alleged to have been procured through such misconduct, is an available remedy. Moreover, presentation of the supposedly tainted testimony before the grand jury could not have undermined the integrity of the judicial process where other, untainted evidence connected defendant to the crime, where, according to *Calandra*, the grand jury could consider evidence so tainted in deciding whether to indict defendant, and where the evidence (defendant's testimony) was not so clearly inadmissible that the prosecutor perpetrated a fraud on the grand jury in presenting it for consideration, *knowing* that it would not be admissible at trial. A prosecutor should not be inhibited in his presentation of a case to a grand jury by fear of dismissal due to his ultimately erroneous, but honest, appraisal of the admissibility of certain evidence for trial purposes.

Even if defendant was in custody illegally prior to his grand jury testimony, and the prosecution was aware of the circumstances of his detention, defendant's testimony would not *necessarily* be inadmissible at a subsequent trial. The inquiry does not end with a determination that defendant's initial detention was unlawful. Rather, a court hearing a motion to suppress would consider the temporal proximity of the initial detention and the statement, the presence of any intervening circumstances, and the purpose and flagrance of the official

misconduct, along with the giving of *Miranda* warnings, in deciding whether defendant's testimony was sufficiently an act of free will to purge the primary taint of the illegal detention. (*Brown v. Illinois* (1975), 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62.) In this case, a considerable period of time passed between defendant's arrival at the police station and his testimony before the grand jury, during which time he was accessible to family members, allowed considerable freedom of movement, and given *Miranda* warnings no less than four times. Defendant's testimony was not so clearly inadmissible that the prosecutor was guilty of misconduct in presenting it to the grand jury.

The circuit court ruled the assistant State's Attorney had "violated defendant's right to due process of law because he used [the] Grand Jury like the Inquisition." The court cited *Boone v. State* (1894), 148 Ill. 440, extensively in its decision.

Initially, we note that the grand jury *is* an inquisitional body:

> " 'It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime.' " (*Calandra*, 414 U.S. at 343, 38 L. Ed. 2d at 569, 94 S. Ct. at 617, quoting *Blair v. United States* (1919), 250 U.S. 273, 282, 63 L. Ed. 979, 983, 39 S. Ct. 468, 471.)

As for the circuit court's reliance upon *Boone*, we find it misplaced. Boone was already "in custody charged with a crime" when he was compelled to testify before the grand jury, "ignorant of his rights." (*Boone*, 148 Ill. at 449.) His testimony was the only evidence before the grand jury. The "danger" which this court found so compelling in *Boone* was engendered by the prosecution's

failure to have Boone apprised of his constitutional rights in order to dispel any belief that he might be required to answer charges made against him. Apparently, the fact that there was no other evidence presented to implicate Boone also underpinned this court's decision. We no longer consider *Boone* good law in view of the sweeping changes that have occurred since 1894. In modern American jurisprudence, the pervasive application of the exclusionary rule adequately addresses the concerns which prompted the *Boone* decision.

Defendant contends (1) that he was entitled to be warned he was a target for indictment, and (2) that the prosecutor's failure to advise him in compliance with section 112—4(b) of the Code of Criminal Procedure of 1963 (the Code) (Ill. Rev. Stat. 1987, ch. 38, par. 112—4(b)) prejudiced him, because the *Miranda* warnings he received failed to *specifically* inform him (as would section 112—4(b)) that he had a right to refuse to answer any question which would tend to incriminate him. We reject both contentions.

It has been held, under factually similar circumstances, that a prosecutor's failure to specifically warn a defendant he was a target for indictment did not offend constitutional guarantees. *United States v. Washington* (1977), 431 U.S. 181, 189, 52 L. Ed. 2d 238, 246, 97 S. Ct. 1814, 1819-20.

First, the events which the *Washington* Court held "clearly put respondent on notice that he was a suspect" parallel similar events in the case at bar. As was the case in *Washington,* defendant here knew that the grand jury was investigating an offense in which he was involved and that his involvement was known—to a greater or lesser degree—to the authorities; he knew that the authorities were questioning his version of events in light of other information known to them; and he received warnings in the grand jury room which were

similar to those Washington received. By the time defendant testified, he was well aware of his potential defendant status. Second, defendant was given *Miranda* warnings, advising him that he had the right to remain silent, that anything he said could be used against him in court, and that an attorney would be appointed for him upon request. Similar warnings in *Washington* were held to have adequately alerted Washington to his right to refuse to answer any question which might incriminate him. The Supreme Court stated in *Washington*:

> "It is inconceivable that such a warning would fail to alert him to his right to refuse to answer any question which might incriminate him. This advice also eliminated any possible compulsion to self-incrimination which might otherwise exist. \*\*\* Indeed, it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled. Moreover, any possible coercion or unfairness resulting from a witness' misimpression that he must answer truthfully even questions with incriminatory aspects is completely removed by the warnings given here. Even in the presumed psychologically coercive atmosphere of police custodial interrogation, *Miranda* does not require that any additional warnings be given simply because the suspect is a potential defendant; indeed, such suspects are potential defendants more often than not." (*Washington*, 431 U.S. at 188, 52 L. Ed. 2d at 245-46, 97 S. Ct. at 1819.)

As the purpose of the admonishments in section 112—4(b) of the Code (Ill. Rev. Stat. 1987, ch. 38, par. 112—4(b)) is to advise a defendant of his right to counsel, and to alert him to his right to refuse to answer any question which might incriminate him, and the Court in *Washington* held that *Miranda* warnings, under factually similar circumstances, adequately address those concerns, we hold that the defendant was adequately advised of his rights.

In sum, we find that the prosecutor's conduct neither prejudiced defendant's right to a fair trial, nor undermined the integrity of the judicial process; therefore dismissal of the indictment was not warranted.

Finally, we note that defendant could not have been prejudiced by the prosecutor's alleged misconduct *or* by the grand jury's use of defendant's grand jury testimony, because defendant would have been indicted in any event. The other four boys who testified before the grand jury stated that they saw defendant and G.C. chasing the victim, this after G.C. had identified the victim and two others with him as gang members ("Stones") and had struck the victim in the head. The chase in which defendant and G.C. were engaged ended when G.C. "kicked [the victim] into the third rail" of the subway, where he was electrocuted.

A person is legally accountable for the conduct of another when, either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid such other person in the planning or commission of the offense. (Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c).) Evidence that defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another. (*People v. Allen* (1974), 56 Ill. 2d 536, 541.) Proof of a common purpose can be drawn from the circumstances surrounding the commission of the act. *People v. Richardson* (1965), 32 Ill. 2d 472, 476-77.

There was some evidence, independent of any alleged impropriety, which connected defendant to the crime. There need only be "some evidence" to connect defendant to the offense charged. (*Rodgers*, 92 Ill. 2d at 288; *People v. Whitlow* (1982), 89 Ill. 2d 322, 331.) This evi-

dence alone would have supported the indictment; therefore, even assuming, *arguendo*, some misconduct did occur, it, and the evidence derived from it, could not have prejudiced the defendant. See *Nova Scotia*, 487 U.S. at 254, 101 L. Ed. 2d at 237, 108 S. Ct. at 2373-74.

In view of the foregoing, we hold that dismissal of the indictment was improper. Therefore, the judgment of the appellate court, reversing the circuit court, is affirmed.

*Affirmed.*

CHIEF JUSTICE MORAN, dissenting:

I respectfully dissent. It is well settled that an indictment procured through prosecutorial misconduct is subject to dismissal. (*Bank of Nova Scotia v. United States* (1988), 487 U.S. 250, 101 L. Ed. 2d 228, 108 S. Ct. 2369; *People v. Rodgers* (1982), 92 Ill. 2d 283; *People v. Linzy* (1979), 78 Ill. 2d 106; *People v. Lawson* (1977), 67 Ill. 2d 449.) This case presents a situation where defendant was the victim of prosecutorial misconduct and was substantially prejudiced as a result of that misconduct.

The totality of the circumstances evidences that defendant was a victim of prosecutorial misconduct. Specifically, when defendant's age and limited education are coupled with the 28-hour period of unlawful detention and the repeated misrepresentations that defendant was merely a witness, the fundamental fairness of the grand jury proceedings was clearly undermined. "[T]he grand jury is an integral part of the court and not the tool of the prosecutor and neither the prosecutor nor the grand jury is vested with power to proceed without regard to due process." *People v. Sears* (1971), 49 Ill. 2d 14, 36.

The police and prosecutors detained defendant for approximately 28 hours without probable cause. Defendant's parents voluntarily brought defendant to the police station at approximately 9 a.m. on August 20, 1984. The

police officers assured each parent that their son would be allowed to return home after questioning. Soon thereafter, defendant's father left the police station when a police officer encouraged him to go to work. At approximately 1:30 p.m., defendant's mother asked a police officer and an assistant State's Attorney if she could take her son home. Her request was denied. Several times during the afternoon, defendant's juvenile officer asked if defendant could return home. Each of his requests was denied. At approximately 7 p.m., the defendant's mother again asked if she could take her son home. Her request was again denied. The police officer informed her that, although her son was not under arrest, he had to stay overnight in order to testify before the grand jury the following day.

Defendant was transferred to the criminal courts building the following morning. Defendant's sister arrived at approximately 9:30 a.m. She was informed that defendant would be allowed to return home after testifying before the grand jury. Defendant's juvenile officer arrived later in the morning and was also informed that defendant would be allowed to return home. At approximately 1 p.m., Assistant State's Attorney Romano interviewed defendant after advising him of his *Miranda* rights. At approximately 2 p.m., defendant appeared before the grand jury.

Prior to his grand jury appearance, defendant was not formally arrested or charged with any offense. Nevertheless, it is manifest that defendant was placed in the custody of the police. First, Detective Henry Sigler testified before the grand jury that defendant was placed in police custody. Furthermore, on several occasions defendant's mother and juvenile officer asked if defendant could leave, and each time their requests were denied. In light of this evidence, the circuit court determined that defendant was detained against the wishes of

his parents for approximately 28 hours. The factual findings of the circuit court will not be overturned on review unless manifestly erroneous. (*People v. Conner* (1979), 78 Ill. 2d 525, 532.) Here, the great weight of the evidence supports the circuit court's determination.

The State asserts that defendant elected to remain in police custody for 28 hours voluntarily, and any reasonable person in defendant's position would have believed that he was free to leave at any time. (See *People v. Wipfler* (1977), 68 Ill. 2d 158 (the test is what the reasonable person would believe if he were in the defendant's position).) In making this assertion, the State ignores the testimony of Detective Sigler. The State also ignores the unrebutted testimony of defendant's mother and juvenile officer, who asked if they could take defendant home, but were not permitted to do so. The State contends that their testimony lacked credibility, because defendant's mother and juvenile officer were unable to name any of the police officers or officials involved. This contention is without merit. As Justice Campbell of the appellate court emphasized in dissent, "It is not reasonable to expect the mother, the sister and the youth counselor to identify any of the police personnel or others when there was no reason for them to know their names and when they fully expected the minor to be released shortly." (164 Ill. App. 3d at 731 (Campbell, J., dissenting).) More significantly, it defies logic and reason to assume that a 15-year-old minor would remain in the hands of the police, for 28 hours, unless he was not free to leave.

Moreover, during the 28-hour period of unlawful detention, defendant, his mother, his father, his sister and his juvenile officer were all told repeatedly that defendant was merely a "witness." Defendant was never told that he was a suspect or a target for indictment. Citing *United States v. Washington* (1977), 431 U.S. 181, 52 L.

Ed. 2d 238, 97 S. Ct. 1814, the majority holds that the State was under no obligation to reveal a witness' target status.

In *Washington*, respondent moved to quash his indictment, arguing that it was obtained in violation of his fifth amendment privilege against self-incrimination. Although respondent was suspected of committing a theft, he was brought before the grand jury as a witness, not as a suspect, to testify about the theft. Respondent was given a series of warnings, but was not specifically told that he might be indicted. Respondent relayed his version of the facts surrounding the theft, but the grand jury chose not to believe his testimony and elected to indict him. The United States Supreme Court held that the indictment was valid, as the prosecutor was under no obligation to reveal a witness' target status. 431 U.S. at 189, 52 L. Ed. 2d at 246, 97 S. Ct. at 1819-20.

However, *Washington* is distinguishable from the instant case. First, in *Washington*, respondent attained the age of majority, but in the instant case, defendant was a 15-year-old minor with a limited education. Furthermore, in *Washington*, respondent did not allege governmental misconduct, but in the instant case, the evidence supports the defendant's allegations of prosecutorial misconduct. During the 28-hour period that defendant was in police custody and not permitted to leave, he was told repeatedly that he was a witness and would be allowed to return home after testifying before the grand jury.

At the beginning of the grand jury proceedings, Romano stated that the instant cause was "John Doe for information," and asked the grand jury to pay attention because the State would be seeking charges. The circuit court found that the prosecutor affirmatively misrepresented the status of the defendant, because he knowingly sought to indict him even though he brought defendant before the grand jury as a witness. The factual findings

of the circuit court will not be overturned on review unless manifestly erroneous. (*People v. Conner* (1979), 78 Ill. 2d 525, 532.) The circuit court's finding that the prosecutor misrepresented defendant's status was not erroneous.

Although Assistant State's Attorney Romano did not become involved in the case until approximately three hours before the commencement of the grand jury proceedings, the prosecutor's office knew throughout the entire period that defendant was more than a mere witness. Defendant would not have been detained overnight, against his parents' wishes, if he was only a witness. Moreover, at the grand jury proceedings, five witnesses, including defendant, testified about the homicide on the "el" platform. Defendant was the only witness to receive *Miranda* warnings before testifying. Under the facts of this case, defendant would not have been advised of his *Miranda* rights unless the State knew that it would be seeking an indictment against him. Although *Washington* does not require that a prosecutor reveal a witness' target status, it does not stand for the proposition that a prosecutor can affirmatively misrepresent that status.

After the 28-hour period of unlawful detention, defendant was brought before the grand jury to testify. However, defendant was not issued a subpoena pursuant to section 112—4 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 112—4(b)). While a subpoena would not have been necessary if defendant chose to testify voluntarily, defendant did not appear before the grand jury voluntarily. The testimony is unrebutted that defendant was not permitted to leave the police station because he was required to testify the following day. The testimony is also unrebutted that defendant was told that he would be permitted to go home after testifying. Common sense suggests that, un-

der these circumstances, the 15-year-old minor testified so that he would finally be permitted to go home.

The 28-hour period of unlawful detention and the repeated misrepresentations that defendant was merely a witness reveals the extent of prosecutorial misconduct in this case. Without the benefit of counsel, defendant incriminated himself before the grand jury. The prosecutor abused the entire grand jury process by employing the grand jury as an inquisitional body to extract a confession from defendant.

While the majority, in a very narrow sense, is correct in characterizing the grand jury as an inquisitional body (*United States v. Calandra* (1974), 414 U.S. 338, 343-45, 38 L. Ed. 2d 561, 568-69, 94 S. Ct. 613, 617-18), its scope as inquisitor "reflects its special role in insuring fair and effective law enforcement." (414 U.S. at 343-45, 38 L. Ed. 2d at 568-69, 94 S. Ct. 617-18.) Our system of jurisprudence is a just, accusatorial system, not an unjust, inquisitorial one. *Rogers v. Richmond* (1961), 365 U.S. 534, 541, 5 L. Ed. 2d 760, 766, 81 S. Ct. 735, 739.

As I would find that defendant was a victim of prosecutorial misconduct, the next question is whether defendant was substantially prejudiced as a result of the misconduct. (*Bank of Nova Scotia v. United States* (1988), 487 U.S. 250, 254, 101 L. Ed. 2d 228, 237, 108 S. Ct. 2369, 2373.) I would find that defendant was substantially prejudiced.

The majority asserts that defendant's right to a fair trial was not prejudiced since a motion to suppress the evidence served as an available remedy. It is axiomatic that where a defendant's fourth, fifth and sixth amendment rights have been infringed, suppression is an available remedy. That, however, is not the question in this case. The question is whether defendant's indictment was procured through prosecutorial misconduct. If so, dismissal is the appropriate remedy. (*People v. Linzy*

(1979), 78 Ill. 2d 106, 110.) To hold otherwise, as the majority does here, would relegate dismissal to a meaningless, toothless remedy. By adopting the majority's reasoning, whenever an indictment is procured through prosecutorial misconduct, suppression of the evidence adduced at the grand jury proceeding would be an available remedy, because the prosecutorial misconduct would invariably involve a fourth, fifth or sixth amendment right. It is important that dismissal remains a meaningful remedy to guard against overzealous prosecution during the grand jury phase of the proceeding.

The majority also asserts that defendant could not have been prejudiced because the testimony of four other grand jury witnesses supported the indictment. The majority cites *People v. Rodgers* (1982), 92 Ill. 2d 283, and *People v. Whitlow* (1982), 89 Ill. 2d 322, for the proposition that there need only be some evidence in support of the indictment. These cases are inapposite, because the issues presented were whether there was *any* evidence to support the indictment. The circuit court has authority to dismiss the indictment if there is *no* supporting evidence, but cannot dismiss an indictment if there is *some* supporting evidence. *Rogers*, 92 Ill. 2d at 290; *Whitlow*, 89 Ill. 2d at 331.

Where there has been allegations of prosecutorial misconduct, the standard of review is not whether there is *some* evidence in support of the indictment. To adopt such a standard would pervert all notions of justice, because an indictment would stand as long as there is *some* supporting evidence, no matter how egregious the prosecutorial misconduct may be. The purpose of judicial review in such a situation is to protect the defendant from overzealous prosecution, and to ensure that the prosecutor fulfills his role as a legal advisor to the grand jury and does not serve in a capacity that unduly influences the grand jury. (2 W. LaFave & J. Israel, Criminal Pro-

cedure §15.5, at 321-22, 326-28 (1984).) To achieve this end, the reviewing court must determine whether the defendant was substantially prejudiced as a result of the prosecutorial misconduct. *Bank of Nova Scotia*, 487 U.S. at 256-57, 101 L. Ed. 2d at 238-39, 108 S.Ct. at 2375.

In the instant case, five witnesses (defendant and four other youths) testified that G.C. initiated contact with Harris, instigated the chase across the subway platform, and caused Harris to fall onto the third rail of the train tracks. They further testified that defendant participated in the chase. Defendant admitted that he participated in the chase with the intent of injuring Harris. Defendant was substantially prejudiced because his admission of his conduct as well as his thoughts influenced the grand jury's decision to indict. Furthermore, G.C. and defendant were the only persons indicted; none of the other persons who participated in the chase were indicted.

The State emphasizes that the misconduct did not prejudice defendant, because he received the standard *Miranda* warnings before speaking with Romano and again before testifying. The question, however, is not whether defendant received and then waived his *Miranda* rights, but whether defendant knowingly, intelligently and voluntarily waived those rights. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) It cannot reasonably be said that defendant knowingly, intelligently and voluntarily waived his *Miranda* rights. Defendant was unlawfully detained for over 27 hours before receiving the initial *Miranda* warnings, and was told repeatedly that he was merely a witness and would be permitted to return home after testifying before the grand jury. Furthermore, neither defendant's mother, father, sister nor juvenile officer were present when he received the *Miranda* warnings.

The *Miranda* warnings did not diminish the prejudice caused by the prosecutorial misconduct. At least one grand juror recognized the impropriety of the proceedings:

"A JUROR: Why didn't you want a lawyer? Why did you refuse a lawyer? Why did you refuse the help of a lawyer?

THE WITNESS: Why?

A JUROR: Why didn't you want legal—when he asked you if you wanted a lawyer, why did you say no?

THE WITNESS: Because I didn't know if I needed a lawyer or not.

* * *

A JUROR: Do [*sic*] your sister know you are here?

THE WITNESS: Yes, ma'am.

A JUROR: She is here with you?

THE WITNESS: No ma'am. She had to go to work.

A JUROR: Did she talk to the State's Attorney or anyone downtown when the police brought you down?

THE WITNESS: My mother and father brought me to the police station.

A JUROR: Your mother and father brought you down here?

THE WITNESS: Yes.

A JUROR: Did they talk to the police?

THE WITNESS: They talked to the police."

Under the circumstances of this case, the defendant was substantially prejudiced as a result of the prosecutorial misconduct. I would reverse the judgment of the appellate court and affirm the judgment of the circuit court.

JUSTICE CLARK joins in this dissent.